UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTHONY M. LINNEN,

                    Petitioner,

                                                    **DECISION AND ORDER**
        -vs-                                        **No. 05-CV-6484(VEB)**

THOMAS POOLE,

                    Respondent.
_____

## INTRODUCTION

*Pro se* petitioner Anthony M. Linnen ("Linnen" or "petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court. Linnen challenges the constitutionality of his state custody pursuant to a judgment convicting him, after a jury trial in Erie County Court of New York State Supreme Court, of one count of second degree (intentional) murder (N.Y. Penal Law § 125.25(1)). The parties have consented to disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1.    Events Leading to Petitioner's Arrest

The conviction here at issue stems from the homicide of sixteen-year-old John Watson, a drug dealer who had a room in the back portion of petitioner's house at 1203 Kensington Avenue in the City of Buffalo. By agreement with Linnen, Watson conducted his drug-selling business out of Linnen's house. Watson's dead body was found on January 22, 1999, on Tariko Place, an alleyway that runs parallel to Kensington Avenue. Tariko Place consists of a network of garages

and alleyways connected to each other or separated by fences, making it difficult to traverse from Kensington Avenue (where Linnen's house was located) to Tariko Place. Indeed, the only way to get from one to the other would be by climbing over a fence or a building. T.461, 484, 622, 624-28, 639.[1]

Watson was found tied up in a fetal position with a telephone cord; his body was wrapped in a bed sheet and was lying on two squares of cardboard. T.314-15. He was dressed in the clothing that his father had last seen him wearing on January 18, 1999 (a black "hoody" sweatshirt, a t-shirt, a blue Army jacket, black pants, and Timberland-brand boots. T.270, 315, 316. There was a piece of paper on the decedent's body that said, in scrawled handwriting, "BSC, one down, two to go, payback".  A pager and a set of keys were found on the body, but no wallet, identifying documents, or money were recovered. T.316-18.

The following day, January 23, 1999, Detectives Ortiz, Krawczyk and Masecchia of the Buffalo Police Department went to 1203 Kensington Avenue in response to a message left on the homicide department's answering machine that a person named "Tony" at that address might know something about the murder of John Watson. Transcript of Suppression Hearing dated June 29, 1999 ("6/29/99 Tr.") at 5, 18. Petitioner answered the door and spoke with the officers. The police did not issue the *Miranda* warnings on that date. When asked if he knew why the officers were there, petitioner responded "because of Baby John," *id*. at 6, meaning John Watson. Petitioner invited the detectives inside to talk about the investigation, but denied knowing anything about it. Petitioner told the police officers that he had last seen Watson in their apartment and in the company of two women on January 19, 1999, sometime between 7:00 and

---

[1]    Citations to "T.__" refer to pages of the transcript from petitioner's trial.

-2-

8:00 P.M. *Id*. at 13-14, 16. Linnen mentioned that the way the body was found sounded like the *modus operandi* of some people from Box Street he had met while he was in prison; they had had told him they would wrap people up and beat them and then dump their bodies. *Id.* at 8, 16.

Detective Ortiz testified that on January 23rd petitioner was co-operative and was "more than willing to let us do or ask him anything that we wanted" 6/29/99 Tr. at 8. Petitioner never asked them to leave or stated that he did not wish to speak any further with them. Before leaving, the police requested and obtained petitioner's signature on a consent-to-search form, and then allowed the detectives to go through the apartment. *Id*. at 9- 10; *see also* Suppression Hearing Exhibit No. 6. Although the officers did not seize anything, Detective Ortiz took note of an assortment of Ramen Noodles in petitioner's kitchen cupboards, believing them to be of some significance given the autopsy finding that the victim had consumed noodles close in time to his death. 6/29/99 Tr. at 11-12. The detectives left petitioner's apartment at about 2:15 p.m.

On January 25, 1999, petitioner failed to report to parole. On January 26, Detective Ortiz called defendant's parole officer to ask about defendant's history and why he was on parole (a manslaughter conviction involving a female acquaintance). Transcript of Suppression Hearing dated October 27, 1999 ("10/27/99 Tr.") at 53, 107.

On January 28, 1999, two other detectives from the BPD, Detective Chella and Detective Giardina, went to 1203 Kensington at 5:15 p.m. in continuation of the Watson homicide investigation. The officers did not read the *Miranda* warnings. Petitioner maintained a cooperative manner, answered questions, and signed a new consent-to-search form. Detective Chella told petitioner he did not have to sign the form if he did not want to, but petitioner signed the form without any signs of reservation. *Id*., 38, 41.

The officers seized some blank lined paper, some paper with handwriting on it, a telephone bill, a pre-test questionnaire for AIDS education, and nine sheets of paper dealing with self-image. 10/27/99 Tr. at 44-45. Detective Chella then asked petitioner if he would accompany the detectives back to police headquarters to provide a statement regarding the last time he had seen the decedent. Petitioner agreed, expressing no hesitation or reservations about doing so. Transcript of Suppression Hearing dated October 19, 1999 ("10/19/99 Tr.") at 25. Petitioner was not handcuffed. No threats were made to defendant and the only promise made to him was that he would be given a ride back home. 6/29/99 Tr. at 45-46. The officers drove Linnen downtown to police headquarters where they conducted an interview and then took a formal statement. *See* Suppression Hearing Exhibit No. 3. At no time did petitioner tell the detectives that he no longer wished to speak with them or inquire about an attorney. *See* 6/29/99 Tr. at 46; 10/19/99 Tr. at 29-30. In fact, petitioner acknowledged at the suppression hearing that he voluntarily gave the police this statement. 10/29/99 Tr. at 20.

Afterwards, the detectives drove petitioner home as promised. 6/29/99 Tr. at 46. Petitioner was still co-operative and consented to letting the detectives look through his house again. When Detective Chella asked the defendant if he could take a blue sheet used as an ironing board cover, petitioner demurred but did allow the officer to cut off a piece of fabric and take that. With petitioner's permission, the detectives also seized a cream-colored telephone cord. *Id*. at 48; *see also* 10/19/99 Tr. at 37-38. The detectives gave Linnen their cards and asked him to call if he heard anything about Watson's death. 6/29/99 Tr. at 48. Linnen claimed at the suppression hearing that, at the end of that meeting, he told the officers the next time they spoke he wanted to have an attorney with him. 10/29/99 Tr. at 22, 23, 79. The police officers testified

that Linnen at no time mentioned having an attorney present at that meeting or any future meetings.

Detective Chella's next contact with petitioner was on February 3, 1999, when he received a phone call from a frightened and upset Linnen, who said that he had been beaten up by a group of gang members and had spent most of the evening at the hospital emergency room. He told Detective Chella that he had gotten assaulted because the police were following him and telling people that he had something to do with Watson's death. Detective Chella told petitioner that he was unable to speak with him at the time but agreed to see him the following morning. Petitioner said that he had to report to Parole Officer Humphrey's office on February 4, at 9:00 A.M., the next morning. Linnen told Detective Chella he could speak with him before or after the parole meeting. 10/19/99 Tr. at 41, 43-44; *see also* 6/29/99 Tr. at 50.

The following morning, February 4, 1999, Detective Chella telephoned Senior Parole Officer Henry Conforti and asked to be made aware if petitioner showed up for his meeting so that the detective could speak with him. By that point, Detective Chella considered petitioner a suspect in the Watson investigation. 6/29/99 Tr. at 48-49, 51.

Petitioner failed to report for his meeting with Parole Officer Humphrey on February 4th. 10/27/99 Tr. at 110. After making an unsuccessful attempt to locate the petitioner in the area of Colorado and East Ferry Streets, Humphrey returned to his office. *Id.* at 112. At 12:45 P.M., petitioner telephoned Humphrey from 76 Hedley Street and said that he had not reported because he had been in the hospital and again explained that he was afraid to come in. *Id.* at 113. Humphrey offered to pick petitioner up in a state vehicle and to bring petitioner in to make his report. Petitioner claimed that Humphrey directed him to stay where he was and told him he

would be there to pick him up. When Humphrey and his partner pulled up to 76 Hedley Street and "honked on the horn," petitioner came out and got in the car. 10/27/99 Tr. at 113. Humphrey stated that petitioner appeared to be happy to see the parole officers and "relieved" to be in the car with them. There was no hesitation on petitioner's part. *Id.* at 122. Petitioner acknowledged, in fact, that he voluntarily went back to the parole office with the officers. 10/29/99 Tr. at 39.

On the way there, petitioner told Humphrey that he was "very afraid to be in Buffalo". 10/27/99 Tr. at 114. According to petitioner, Humphrey told him that he would have to speak with Conforti who was "pissed off" because petitioner did not show up on time for his parole interview. 10/29/99 Tr. at 40. Petitioner testified that at that point there was "no question in his mind that he was going to be violated", *id.*, that is, found to have violated the conditions of his parole agreement.

Once at the parole office, petitioner admitted to Humphrey and Senior Parole Officer Conforti that he had been using marijuana and cocaine. 10/27/99 Tr. at 114. Humphrey explained that such allegations, if true, would not necessarily result in a parole violation but would be in the discretion of the parole officers. While Humphrey did not remember discussing with Conforti whether he would file a violation report, he testified he believed that it was "understood" that he would be filing a report for Conforti to review in making his determination as to whether a warrant would be filed. *Id.* at 50-51, 115-117.

At approximately 2:00 P.M., Conforti called Detective Chella to tell him that petitioner was in the parole office. Chief Riga accompanied the detective to the parole office. *Id.* at 119; *see also* 6/29/99 Tr. at 51. They were greeted by Conforti, who told them that petitioner was in an office talking with Parole Officer Humphrey. Detective Chella stated that he walked in and asked

petitioner if he would accompany the detectives back to the homicide office. The detective acknowledged that petitioner was "hesitant," wanting to know the purpose of the interview. 6/29/99 Tr. at 51. The detective explained that they wanted to speak with them about the Watson murder again. *Id*.

Chief Riga testified that petitioner was not in custody of parole at this time. 10/27/99 Tr. at 4. He further testified that petitioner was not handcuffed, and that he did not recall petitioner ever having requested an attorney or expressing any reservations about going back to the homicide office with the detectives. *Id.* at 25-26. Parole Officer Humphrey testified that petitioner showed no reluctance about going with the detectives and that he never inquired as to whether he "had to go or about an attorney". *Id.* at 120-22.

Although Chief Parole Officer Conforti told Detective Chella that petitioner had violated his parole, the detective was not advised that petitioner was in custody or not free to leave the parole office. 10/19/99 Tr. at 50-51. Conforti testified, "[F]rom what I did hear, [petitioner] agreed to talk with Detective Sergeant Chella. He went into a room with [the detective] for a couple minutes, then Chella came out and said to me, 'He said he'd go.' And I said, 'Good. Take him away. Don't lose him.'" *Id.* at 71. Detective Chella understood that to mean he was to call parole when the detectives were done with petitioner. *Id.* at 57). According to Detective Chella, if petitioner had said he did not want to go with him to the homicide office, Chella would have left him at the parole office. If, once they got to the homicide office, petitioner had told him that he did not want to talk, the detective would have called parole as instructed, or taken petitioner back to parole. 10/19/99 Tr. at 54-55. Detective Chella also testified that petitioner went voluntarily, expressing no reservations about leaving with the detectives. Detective Chella never heard

petitioner inquire about an attorney. 10/19/99 Tr. at 59-60.

Petitioner then accompanied the detectives back to the homicide office where Detective Chella read him his *Miranda* rights from a card. In response, Linnen stated "I'll talk to you, man." *Id.* at 62. Petitioner later signed the card next to an "X" placed by Chella on the card. 10/19/99 Tr. at 60-61; 6/29/99 Tr. at 53-57. Petitioner claimed that he was told by Detective Chella that the only way to activate his right to an attorney was to sign the card next to the warning which explained that he had such a right. Detective Chella explained that he merely asked petitioner to sign in a blank space, and that the location chosen had nothing to do with the text next to petitioner's signature. 10/19/99 Tr. at 76; 10/29/99 Tr. at 54-60. The detective further stated that petitioner did not verbally ask for an attorney at this time. 10/19/99 Tr. at 75-76; 6/29/99 Tr. at 61.

Detective Chella spoke with petitioner until 5:06 P.M. During this two and one-half hour interview, petitioner proceeded to make several statements and admissions which implicated him in the death of John Watson. Detective Chella testified that there were no threats or promises made to petitioner to induce him to testify. During the interview petitioner was granted access to the telephone when he wanted it and was given refreshments and cigarettes. According to Detective Chella's notes and testimony, petitioner became visibly upset during the interview on a number occasions and was given time to compose himself. Eventually the detective asked petitioner if he would reduce his statements to a formal written statement, petitioner refused and, for the first time, requested an attorney. Detective Chella stopped his questioning immediately. 6/29/99 T. at 61-63; 10/19/99 Tr. at 77-89. Two days after the interview, with the aid of notes that he had taken and his memory, Detective Chella prepared a police report which contained the

sum and substance of his conversation with the petitioner. *Id.* at 66-69; Suppression Hearing

Exhibit No. 4.

### 2. Petitioner's Confession

What follows is a synopsis of petitioner's oral statement to Detective Chella made over a

period of approximately two and one-half hours, memorialized in a 14-page single-spaced type-

written statement. *See* People's Trial Exhibit 59; *see also* Suppression Order at 4, Respondent's

Exhibit ("Resp't Ex.") at 174. Detective Chella informed petitioner that he would record their

conversation by writing it down; there was no equipment in place in the interview room to

videotape or audiotape the questioning. T.364-65. At trial, Detective Chella testified to the

substance of Linnen's oral statements based upon his written notes of the interview. Several

minutes after the interrogation began, Detective Ortiz joined Detective Chella, and remained in

the room until the interview with petitioner was completed.

Linnen, who had a bachelor's degree from Canisius College, stated that he was receiving

"some psychiatric care for what he termed a "compulsive disorder, motion [sic] not totally

developed[.]" T.365-68. Linnen said he was taking medication (Prozac and Wellbutrin), but had

not taken it in a couple of days, and that he was seeing a psychiatrist as well as a counselor,

Gwen Herbert. T.365-68. However, Detective Chella testified, petitioner never said that he did

not feel well enough to answer their questions, nor did he appear to have any difficulty

understanding the detectives; his answers were always responsive and coherent. *Id.* When

petitioner was informed that his psychiatric counselor, Gwen Herbert, had provided some

information to the police, he became "rather upset." T.368.

Petitioner then brought up a female acquaintance named Gwen Mitchell, an "older

woman" with whom he was romantically involved. Petitioner asserted that Mitchell often paid him to have sex with her. T.369. According to petitioner, Mitchell had gotten mad at him because he was dating other women, and he was afraid of her because she had sons his age who had beat him up in the past. *Id.*

Focusing Linnen back to the homicide, Detective Chella questioned him as to the last time he had seen Mitchell. Linnen was not sure; at first he said that it was January 19, 1999. T.371. Linnen then explained that he had seen Gwen Mitchell on January 22 or January 23, 1999. T.373. She had come to his house with a pint of rum, and they then went back to her house, where they had sexual intercourse and she gave him "sixty dollars for fucking her." *Id.* The two went over to Mitchell's daughter's house, and she later dropped him of at a McDonald's restaurant. Asked what he did with the $60, Linnen replied, "'what do you think." T.374.

When asked about his last contact with the decedent (to whom Linnen referred at times as "Ali" to Detective Chella), Linnen at first said that it was January 19, 1999, at Linnen's house on Kensington. T.375. Two women were there, "Carmen" and "T". When the decedent came home, he "got mad" because "the young ladies were there" and commented that Linnen "would never change." T.376. As a result, Linnen asked Carmen to leave with "T" and come back later. *Id.*

Linnen asserted that the decedent did not give him any drugs or money, that he did not need the decedent's money, and that he had $250 that he had received from his sister and from a job.

Watson eventually left petitioner's house again for a while. Later on the night of January 19, 1999, petitioner started paging the decedent because "he was worried about [the decedent] because he had not shown up back at the apartment." T.378. When asked what the decedent had

eaten prior to leaving on January 19th, petitioner said that he had some coldcuts and bread in the refrigerator and that decedent had made a sandwich. Detective Chella commented that when the police had been there on January 28, 1999, it did not appear that there was any food in the refrigerator, and Gwen Mitchell, Linnen's paramour, had told them that she often had to supply him with food. T.378. Because the autopsy revealed that the decedent had consumed noodles shortly before his death, Detective Chella asked petitioner if he had any "Ramen"-brand noodles at his house, and petitioner replied that he did, in the kitchen cabinet. T.379.

At that juncture during the police interview, Linnen's demeanor changed, according to the detectives: Linnen became "a little more aggressive, a little more frustrated[,]" and appeared upset. T.379. Petitioner then announced, for the first time, that he "often has blackouts" that last for "[d]ays at a time" and that he "can't remember details." T.380. When Detective Chella asked petitioner to give an example of what someone told him he did during these blackouts, petitioner said that he once was told that he had jumped from building to building in a "dangerous" way. T.381.

Detective Chella testified that petitioner had not made any reference to these lengthy blackouts when the police first talked to petitioner on January 28, 1999. *Id.* Detective Chella asked petitioner how he could know for sure that he did not kill "Baby John" if he had these blackouts, and petitioner "stated 'that he just couldn't[,]' '[t]hat he loved that nigger.'" T.381.

Petitioner, throughout the interview, commented that he thought of the decedent ("Baby John") "as like his son . . . ." *Id.* Linnen explained to Detective Chella "that he [petitioner] was trying to steer him [decedent] away from the life that he saw Baby John having of drugs and selling drugs; and that he mirrored Baby John; that he had made mistakes and he was trying to

make Baby John not make the same mistakes that he did throughout his life."  T.377.

After Detective Chella directly confronted petitioner about killing "Baby John," he gave petitioner "a little time to compose himself" because petitioner had "become visibly angry[.]" T.382. To try to re-direct petitioner's anger, Detective Chella offered petitioner some refreshments; petitioner asked for a clear soda pop. T.383. The detectives remained in the room while petitioner drank it.

When it appeared that petitioner had calmed down, Detective Chella commented that the police had received information that the sheet in which the body was found had been given to him by his girlfriend, Gwen Mitchell, on the day of the death, and that with her permission they had obtained the matching sheet. T.383-84. According to Detective Chella, petitioner "became a little concerned about that" and stated that he had "had that sheet for awhile prior to the death." T.384. Petitioner did not ever admit to getting a sheet from Mitchell. T.386.

Detective Chella advised petitioner that Mitchell had told the police that petitioner had asked her for garbage bags and some rope. T.384. The detective told petitioner that if these things were true, "he was probably responsible for the death of Mr. Watson[,]" to which petitioner replied that he "had blackouts and he couldn't remember." T.385. Detective Chella noted that petitioner was the last person to see the decedent alive, and the decedent's body was found 70 yards from petitioner's house. When he asked petitioner to explain those circumstances, Linnen replied that "he had blackouts" and that Detective Chella "did not know what it was like to have these blackouts." T.391.

At this point, Detective Chella testified, petitioner's demeanor became "a little more down, a little more depressed" and he asked to call his mother in New York City. When told that

it would have to go through the homicide department operator because it was long-distance, petitioner asked to make a local call, at which point both detectives left petitioner alone for about ten minutes. T.393. When they returned, petitioner began talking about how he had written a computer program for drug rehabilitation for the Red Cross, "not as a crackhead, but knowing it," but they only paid him a "dollar an hour" and they "fucked [him]" and "dumped [him]" because he was "an ex-con." T.396. He told Detective Chella, "You don't know [what it's like]." *Id.*

Petitioner then explained that during the week in question he "had been out hustling [for four or five days] and that's where he had got the money, doing it legally," apparently by using his computer skills to write menus for restaurants. T.396. He said he was doing it "[t]o show Baby John that he could [make money] without selling drugs." *Id.* According to Detective Chella, petitioner then "started to cry and put his head down and started to mumble some things to himself." T.396-97. When petitioner resumed speaking, he said that when he had returned to his apartment after being gone for those several days, "Ali [the decedent] had told him that he [petitioner] had to leave the apartment, that he was taking it over and he [petitioner] had to get out[,]" otherwise "they'll find [petitioner] dropped [sic], junkie, crackhead." T.397. Detective Chella testified that petitioner became upset at this point, and picked up a coffee mug that was being used as an ashtray and slammed it on the table. T.397. Petitioner announced "that he had gave [sic] that nigger more than [him]," and "[a]nything in [petitioner's] house was [decedent's]." T.397.

Petitioner then remarked that "he should have gotten rid of him, Baby John, first because of the way he treated [petitioner]," and that he saw "Baby John as himself and that he was the

past coming back to the future to let [Baby John] know what his future looks like." T.398. Petitioner related that the decedent then left the house saying, "[W]e'll see when I get back." T.398. The decedent, as he was leaving, kicked out a Jamaican man "who was bugging out too much". T.399.

Petitioner was "scared that the boys, [sic] were going to come back and get him." T.398. Petitioner said that the decedent had pulled a gun on him once before and to "show him that there was consequences to his actions, he had placed the barrel in his own mouth." T.399. When the decedent returned a short time later, they had a conversation in the hallway, apparently with the Jamaican man standing outside the door, still bugging out and ringing the doorbell. T.400.

Again petitioner brought up the blackouts, and told Detective Chella that he had been high for three or four days, beginning on January 22, 1999, before this last meeting with the decedent. T.401. Without being questioned or prompted, Detective Chella testified, "He just looked up at me and stated, I think I may have killed him. All the evidence points to it." T.402. Petitioner then "started crying" and "put his head down"; his "fists were clenched." T.402. Petitioner's demeanor changed from saddened to angry, and he said that he had not been high on January 22, 1999, but had started getting high on January 18, 1999, and remained high for two to four days. T.402-03. He explained that as a result of being high, "he had blackouts, loss of memory." T.403. Petitioner announced, "I loved that boy[,]" meaning the decedent. T.403.

Detective Chella then turned the conversation back to the last interaction between petitioner and the decedent, asking what Baby John was doing to him. T.404. Petitioner stated, "[H]e began choking me in my house. Ras [the Jamaican] was gone. I was coming in and out" of consciousness. T.404-05. He could not believe that Baby John was doing this to him because

petitioner had "treated him so fairly, treated him as a son." T.405. Petitioner said that "Baby John" was "calling him a crackhead, telling him that he was never going to change[,]" and that he was taking over petitioner's house. T.405. Petitioner asked Baby John to "please get off him" and Baby John replied that he "had killed 17 motherfuckers; do you think one more crackhead is going to matter[,]" at which point Baby John "grabbed him in a chokehold and pushed his back up against the wall." T.406. Petitioner got up from the table and demonstrated these actions to Detective Chella. T.406-07. Petitioner told "Baby John that if he did not stop this," meaning dealing drugs, he "would become like [petitioner]." T.407. Petitioner related that "Baby John" then kicked him the groin, causing petitioner to go down; as petitioner did so, he pulled out the decedent's legs from under him, causing him to fall also. T.407-08. According to petitioner, the decedent was also punching him and telling him that he was going to die. T.408. Petitioner said that even though he had a bad back and a slipped disk, he was "kicking [the decedent's] ass", knocking him down and straddling him. T.409. Going through petitioner's mind was the thought that "if this nigger gets up, he tells his friends, they're going to get me." T.409, 410. Then petitioner said that the decedent was "kicking [petitioner']s ass" and that it "seemed like a dream." T.410. Petitioner was holding onto the decedent "real hard" and "telling him to stop, hold on." T.410, 418.

The next thing petitioner said to Detective Chella during the interview was, "I want PC," meaning protective police custody. T.411. He was concerned that "the boys would get him in jail." *Id.* Petitioner then began asking about the sentencing structures for the various homicide crimes–i.e., murder and manslaughter in the various degrees– and what would he be receiving for this case. T.411. Petitioner specifically asked "what kind of [prison] time he would get if he was

convicted of manslaughter first or murder second." T.412. Detective Chella replied that it was too early to tell and that it was the court's responsibility. T.412.

At that point, petitioner announced, "I did not intend to kill John Watson." T.412. Detective Chella steered the conversation to the means of getting the decedent's body to Tariko Place. Petitioner did not respond, but asked to make a phone call to his sister. He did so with Detective Chella in the room; he left a message and a Muslim greeting on the answering machine. Detective Chella hung up the phone and asked petitioner to get back to describing the struggle, to which petitioner stated that the decedent was going to kill him, and that he had tried to calm the decedent down. Petitioner stated that the decedent had pulled a gun on him [petitioner] once before. T.414. Petitioner stated that he had not had sexual relations with the deceased, and that what people were saying about their relationship was untrue. T.415. Petitioner specifically said that he was not sexually interested in the decedent. *Id.*

Petitioner told Detective Chella that he "didn't remember" at what point he knew that "Baby John was dead, that he blacked out, that the deceased was lying there." T.416. Petitioner checked to see if the decedent had any money or drugs on him, but he did not. T.416. If Watson had, petitioner was "going to leave the drugs on him to use . . . as a means to have the police sort of get away from [petitioner]." T.416.

Detective Chella then asked petitioner how he had choked the decedent; he had never disclosed to petitioner that he had an understanding of how the strangulation had occurred. T.417. Petitioner began by saying that the decedent was facing away from him; petitioner then looked at Detective Chella said, "[Y]ou got his coat don't you," and stated that he had used the strings on the decedent's "hoody" to choke him, as the decedent's back was to petitioner's chest.

T.417. Petitioner had not been advised that any clothing had been collected from the decedent's body. *Id.*

When asked if he tried to assist the decedent in any way, petitioner said that he did not do mouth-to-mouth resuscitation, but briefly attempted CPR, demonstrating his actions for Detective Chella by cupping his hands and thrusting them up and down on the table in the interview room. T.418. Petitioner explained that "he was confused and that . . . he tried, but he got no response and that there was no one else there and he was high." T.419.

Detective Chella could see that petitioner was starting to get a little tired, so he told petitioner that he only had three more questions–"how did the deceased die, how did you tie him up, and how did you get him into the alleyway . . . ." T.419. Petitioner explained that he put the decedent's body in an appliance box he had found outside his apartment, that he put the body in the box, and carried it over the snow, and discarded the box. T.420. Detective Chella asked him who had helped him wrap up the body. Petitioner claimed that he did not recall wrapping up the body. In any event, petitioner would not answer, commenting, "It doesn't matter" and he "just didn't want to get anybody else involved." T.421. At this point, petitioner announced that he was "going to do 20 years after this." *Id.* Petitioner continued by saying "[t]hat he's been high, that it gets him away from this, that he doesn't have to deal with this." T.422. At that point, he told Detective Chella that he had been high for the previous three weeks. T.422. He remarked that he did not know that the decedent was sixteen-years-old and that he "thought of him as [petitioner's] own child, that [the decedent's] own father didn't treat him very well and that he [petitioner] tried to be this fatherly image to him." T.422. Petitioner commented "that he bought gifts for kids with his money" and "tried to show [the decedent[ how he could deal, but still not

hurt people with it." T.423.

Petitioner then told Detective Chella that the decedent would not give him back the keys to his own "motherfucking house" and that he wanted to "get high every time I remember him" in order to forget. T.423. Petitioner announced, "I got pissed off when they said there was semen in [the decedent's] ass. I loved him, not like that." T.424. However, petitioner had never been told by the police or any other official that semen had in fact been found in the decedent's rectum. T.424.

Detective Chella returned the subject of how the body was wrapped; petitioner would not reply, stating simply, "I wrapped him up, leave it alone." T.424-25. When asked if he knew of any paper found on the body, petitioner acknowledged that he had written the note found on the body that said "One down, two to go. I don't remember the initials." T.425. Detective Chella had not disclosed to him what in fact was written on the paper. T.425.

Detective Chella then asked if petitioner would be willing to give a formal statement, to which petitioner replied that he "wanted to have his lawyer with him." T.426. Detective Chella asked who his attorney was, and petitioner replied that the police had to provide an attorney for him. At that time, it was 5:06 p.m.; the interview had begun at 2:25 p.m. T.426. Detective Chella ceased his questioning immediately. T.426. Petitioner was crying and asked to use the phone to call his sister. The Detectives then left petitioner alone in the interview room with the door ajar for about five minutes. T.427.

Detective Chella returned with Chief Riga after about five minutes; Detective Chella told petitioner that he was under arrest. T.428. At that time, petitioner inquired, this time of Chief Riga, about police protection based upon his fears of what would happen to him in jail, and asked

Chief Riga "to have the story low profile." T.428. Chief Riga responded that it was public information, and that the press had free access to it. T.429. Petitioner also stated to Chief Riga, without inducement, "I didn't mean to kill that boy. I have a breaking point. Sometimes I just snap." Petitioner then stated, "He [the decedent] tried to take my shit and throw me out of my house." 10/27/99 Tr. at 6, 8.

Since petitioner seemed upset, Detective Chella did not put handcuffs on him immediately. T.429. Both Chella and Chief Riga left petitioner alone to smoke for awhile. T.431. Petitioner was not handcuffed until he was taken down to be booked, a five or ten-minute procedure, after which he was taken to his cell. T.431. Detective Chella testified that petitioner was never able to provide a specific date on which the death occurred. T.433. Petitioner's phone calls to Chella on February 3, 1999. T.434-36.

At no time during the interview did petitioner ask for a phone book to look up attorney phone numbers; he did not indicate that, when he signed the printed *Miranda* card, that he was requesting a lawyer. T.436-37. Detective Chella denied telling petitioner that it would take four to five hours to obtain a lawyer for him, or asking petitioner to look at photographs or listen to any tapes. T.437. Detective Chella was not aware of any videotaping or audiotaping equipment being activated in the interview room; he explained that the recording equipment was actually located in Chief Riga's office. T.438.

### 3. Other Evidence Presented at Petitioner's Trial

The decedent sold drugs out of petitioner's house on Kensington. *See* T.751, 958, 978, 1067. A number of witnesses testified that they "got high" there. *See* T.750, 760, 957-58, 985-87, 1077-78, 1106-08. Some witnesses testified that petitioner was sexually interested in the

decedent, but this interested was not reciprocated. Gwen Mitchell, petitioner's paramour, testified that petitioner told her that the decedent was his lover but later retracted this statement. T.148.

In his movements prior to his death, it was revealed through testimony that decedent left his father's house after eating dinner around 7:00 p.m. on Monday, January 18, 1999, and never returned. T.269, 291. He did not attend school January 19, 1999, through January 22, 1999. T.1228. Raychell Smith ("Smith"), a schoolmate of the decedent's, claimed that she saw him alive on January 19, 1999; however, she did not testify at trial. Trial counsel agreed to stipulate that Smith saw the decedent on the morning of January 19, 1999, and again later that evening. At about 8:50 p.m. on January 19th, the decedent received a message on his pager and then departed. T.1119-20. Smith did not see him again. Damita Love-Jones ("Love-Jones") testified that she had witnessed disagreements between petitioner and the decedent over how much cocaine decedent was giving him; petitioner believed that the decedent was taking advantage of his kindness. T.753-54. Love-Jones, who had sex with the decedent in return for being supplied with drugs, paged him at about 2:30 a.m. on January 20, 1999, in order to buy some drugs, but he did not return her call. T.756.

At about 5 A.M. on Wednesday, January 20, 1999, petitioner called his friend Valerie Hammett and told her that he had paged the decedent all day and that the decedent was "missing." T.963. Petitioner told her he had seen Watson on Monday, January 18th, when Love-Jones and her cousin were at his apartment.

On Wednesday evening, Gwen Mitchell saw petitioner staring out of his window; according to Mitchell, he seemed disoriented and asked her for the date and time, and a cigarette.

T.240-41. Twenty minutes later, he came over to her apartment and said that he was being evicted from his apartment and had "other problems." T.213, 215. At petitioner's request, Mitchell gave him a bed sheet, a garbage bag, and some surgical gloves. Petitioner had also asked her for some rope, but she did not have any so petitioner cut the cable cord from her basement. T.215. Petitioner told Mitchell that he was cleaning up his house and wanted to throw away some old clothes and his couch.

The medical examiner who performed the autopsy testified that in his opinion the decedent probably died between 9:00 A.M. on Tuesday, January 19, 1999, and 9:00 A.M. on Thursday, January 21, 1999.   With regard to manner in which Watson died, the medical examiner testified without challenge that he was intentionally killed, T.1189-1227. The cause of death was strangulation by ligature. T.1204, 1211, 1218. According to the medical examiner, absent from the decedent's body were any defensive injuries which would have indicated a struggle between him and his assailant. The decedent did have two abrasions on his skull, which the medical examiner testified were consistent with blunt force injury caused by, for instance, a person's fists. The medical examiner testified that it would have been "almost impossible" for strangulation to have occurred, given the physical findings, if the strangler had been standing in front of the victim. Thus, the medical examiner concluded that the assailant was standing behind the victim and, if there was no struggle, ten to twenty seconds would have elapsed before the victim lost consciousness, with death following about a minute thereafter. T.1222-24.

**4.     Verdict and Sentencing**

The trial court instructed the jury to consider whether petitioner's admissions to the police were freely and voluntarily made after a valid waiver of his *Miranda* rights. The trial court

also instructed the jury on the defense of justification (self-defense) and the defense of extreme emotional disturbance ("the EED defense"). Along with the charged offenses of intentional and depraved indifference murder, the lesser-included offenses of first degree and second degree manslaughter were submitted for the jury's consideration. Petitioner was convicted of intentional murder and subsequently sentenced to 25 years to life in prison.

5.    **The Direct Appeal**

New counsel represented Linnen on his direct appeal and raised the following arguments: (1) the trial court erred in failing to suppress petitioner's statements to the police, because, *inter alia*, he allegedly was taken "in custody" by the parole officers and therefore his New York state constitutional right to counsel had attached before his subsequent interview with the police officers, was not advised of his *Miranda* rights, and the police ignored his invocation of his right to counsel during the interview; (2) the trial court erred in its handling of two issues that arose in connection with a juror; (3) petitioner "was denied a fair trial contrary to the constitutions of the state of New York and the United States" because (a) the trial court erroneously determined that the prosecution could ask petitioner if he had been previously convicted of first degree manslaughter, without getting into the details of the crime, and whether he was on parole at the time of the decedent's death, and declined to accept defense counsel's proposal of a "*Sandoval*[2]

_____

[2]       *People v. Sandoval*, 34 N.Y.2d 371, 377 (N.Y. 1974) (a defendant is entitled to a pretrial ruling as to the permissible scope of cross-examination concerning his prior criminal history); *see also People v. Bermudez*, 98 Misc.2d 704, 708, 414 N.Y.S.2d 645, 648 (N.Y. Sup. Ct. 1979) (The *Sandoval* compromise permits prosecutor to ask testifying defendant one question, or perhaps two where both pertinent previous felonies and misdemeanors are involved, with respect to all prior convictions and connected underlying and immoral acts and, if defendant gives expected affirmative answer and does not voluntarily advance misleading or unwarranted claims or denials, no further cross-examination on that subject will be allowed and there may be no further credibility attacks along those particular lines as to other underlying facts, acts or incidents.)

compromise" restricting the prosecution from asking petitioner whether he had been previously convicted of a felony and whether he was on parole at the time of the offense; (b) the trial court erroneously denied the defense motion to reopen the suppression hearing upon the discovery of new evidence disclosable under *People v. Rosario*, 9 N.Y.2d 286 (N.Y. 1961), as statements of prosecution witnesses; (c) trial counsel was ineffective in stipulating as to the testimony of Raychell Smith as to when she had last seen the decedent alive; (d) "[d]efense counsel never delivered what he promised" and failed to retain an expert witness in support of the "extreme emotional disturbance" defense; (4) petitioner's conviction was against the weight of the evidence; and (5) petitioner's sentence was harsh and excessive.

The Appellate Division, Fourth Department, unanimously affirmed Linnen's conviction in a memorandum decision and order. *People v. Linnen*, 309 A.D.2d 1280, 765 N.Y.S.2d 559 (N.Y. App. Div. 4th Dept. 2003). In the letter application seeking leave to appeal to the New York Court of Appeals, Linnen's appellate counsel specifically requested review of all of the issues raised in her brief and her client's *pro se* supplemental appellate brief. Appellate counsel also included a new claim–that the prosecution did not prove all of the elements of the charges against Linnen beyond a reasonable doubt as required by the due process clause of the United States Constitution, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Petitioner's Appellate Counsel's Leave Letter ("the Leave Letter") at 4, Resp't Ex. B. On January 8, 2004, the New York Court of Appeals denied leave to Appeal. *See* Certificate Denying Leave, Resp't Ex. B; *People v. Linnen*, 1 N.Y.3d 598 (N.Y. 2004).

### 6.    Petitioner's *Pro Se* Motion to Vacate the Judgment

Linnen's notice of appeal was filed in 2000. While his direct appeal was pending, he filed

a *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10(1)(b), (c), (d), (f), and (h) on September 25, 2002. *See* Resp't Ex. C.  The Appellate Division affirmed his conviction on direct appeal in October 2003, and the County Court denied the C.P.L. § 440.10 motion two months later on December 2003.

The grounds asserted in support of the C.P.L. § 440.10 motion were that (1) trial counsel failed "to independently investigate and test the indictment against him; (2) trial counsel tendered misleading and fraudulent advice, leading to petitioner's decision not to testify at trial; (3) petitioner was denied his "state and federal constitutional rights to an impartial jury, a jury of his choice, and the effective assistance of counsel by his assigned-counsel's failure to exercise the defendant's request to remove a statutorily unqualified juror from the jury panel"; (4) the County's assigned-counsel system, *see* N.Y. COUNTY LAW 722, deprived him of his Sixth Amendment right to effective representation due to the inadequate rates paid to assigned criminal defense attorneys, as well as denied him his state and federal constitutional rights to a fair trial, due process, and equal protection of the laws"; (5) the police and the prosecution failed to disclose alleged *Brady*[3] and  *Rosario* materials "generated, collected and/or recorded by Detectives Ortiz and Chella during their investigation" and therefore his statements to police should have been suppressed; (6) the trial court made "erroneous rulings, misrepresentations of sequential facts within its suppression order, and failures [sic] to follow the rules of criminal procedure and established case law"; (7) petitioner's statement to the police violated his rights against self-incrimination, the assistance of counsel, and due process of law; (8) the Buffalo Police Department's failure to use its recording equipment to memorialize petitioner's

---

[3]     *Brady v. Maryland*, 373 U.S. 83 (1963).

interrogation violated police department guidelines and policies deprived the fact-finder at the suppression hearing a "fair and objective means of review of . . . the interrogation" thereby depriving petitioner of his constitutional rights to counsel, a fair trial, due process, and the right against self-incrimination; (9) the "prosecutor's prejudicial summation, failure to seek *Molineux/Ventimiglia*[4] rulings regarding alleged prior bad acts of the defendant, encouragement of false testimony, failure to truthfully give reasons for not producing a crucial missing witness, and manipulation of photographic evidence" deprived petitioner of his right to a fair trial and due process; and (10) a C.P.L. § 440.10 motion "may be used to correct factual irregularities for appellate and federal review where assigned-counsel has failed, by neglect or misrepresentation, to adequately preserve and protect the record for informed appellate and federal review in violation of the defendant's rights to due process and the effective assistance of counsel. *See* Petitioner's Memorandum of Law in Support of C.P.L. § 440.10 Motion ("the C.P.L. § 440.10 Motion") at 1-10; *see also id* at 11-115, Resp't Ex. C.

### 7.  Petitioner's Federal Habeas Petition

Among the attachments to Linnen's form Petition for a Writ of a Habeas Corpus is document titled "Facts and Constitutional Questions" comprising thirty-three pages of factual background and allegations, (Dkt #1), followed by twenty-four (24) "Issues that the Defendant Wishes to Present to this Court for Habeas Corpus Consideration . . . which are based on the preceding facts . . . ."  For ease of reference, the Court has attempted to set forth the main

---

[4]  Evidence of prior uncharged crimes may be received if it is relevant to establish some element of the crimes under consideration or if it is relevant under one of the recognized exceptions to the general rule to show 1) intent, 2) motive, 3) knowledge, 4) common plan or scheme, or 5) identity of the defendant. *People v. Molineux*, 168 N.Y. 264, 293 (N.Y. 1901). When seeking to have *Molineux* evidence admitted, the prosecutor "should ask for a ruling out of the presence of the jury," *People v. Ventimiglia*, 52 N.Y.2d 350, 362 (N.Y. 1981); *People v. Small*, 12 N.Y.3d 732, 733 (N.Y. 2009).

constitutional claim raised by each "Issue" based upon the subject matter of the allegations. There are several "Issues" which address the same basic underlying claim, such as, for instance, the voluntariness of petitioner's confession. Where feasible, the Court has grouped the "Issues" discussing the same or similar allegations under the same point heading.

## ANALYSIS OF THE PETITION

**1.     Admissibility of Petitioner's Statements to Police (Petitioner's Issues 1, 10, & 11)**

> "Issue 1:      Whether there is evidence to support the position of the lower courts that the appellant voluntarily and knowingly waived his *Miranda* rights and whether, as a matter of law, both courts applied the proper standard in determining that the appellant had waived his right to counsel."

> "Issue 10:     [T]rial court's erroneous rulings, misrepresentations of sequential facts within its suppression order, and failure to properly follow the rules of criminal procedure and established case law."

> "Issue 11:     Whether the [petitioner] was denied the Federal constitutional right to a fair trial by the introduction , into evidence, of an alleged confession generated in violation of the [petitioner]'s Federal constitutional rights against self-incrimination, the assistance of counsel, and due process of law."

Linnen raised these issues at the trial court level in connection with his suppression motion, in regard to which the trial court conducted a hearing over multiple days. Linnen testified at the hearing, along with the Buffalo police detectives and his parole officers. The suppression hearing testimony has been summarized above in this Decision and Order in the "Factual Background and Procedural History" section. Following the suppression hearing, the trial court issued a decision and order in which it made the following findings of fact: (1)  petitioner was not "in custody" during his interviews with his parole officers, Conforti and Humphrey, which occurred

prior to his oral admissions to Detective Chella on February 4, 1999; (2) petitioner voluntarily

accompanied the police to headquarters on February 4, 1999; (3) petitioner was administered the

*Miranda* warnings by Detective Chella and knowingly, voluntarily, and intelligently waived his

right to counsel thereafter; (5) during the interrogation with Detective Chella petitioner made

inculpatory statements to Detective Chella *before* he made any telephone calls; and (5) petitioner

was not under the influence of drugs or alcohol during the interrogation. *See* Memorandum and

Order of Erie County Court dated April 19, 2000 Denying Suppression Motion ("Suppression

Order") (Dkt. #17-3); *see also* Resp't Ex. F.

On appeal, appellate counsel argued that the trial court erred in failing to suppress

petitioner's statements to the police on February 4, 1999, because, *inter alia*, he allegedly was

taken "in custody" by the parole officers and therefore his New York state constitutional right to

counsel had attached before his subsequent interview with the police officers; he was not advised

of his *Miranda* rights; and the police ignored his invocation of his right to counsel during the

interview. The Appellate Division specifically addressed and analyzed Linnen's arguments

concerning the suppression of his statements as follows:

> Contrary to the contention of defendant, [the] County Court properly determined
> that his oral admissions to the police were made after he knowingly and
> voluntarily waived his *Miranda* rights (*see People v Denis*, 181 AD2d 1017,
> 1017-81, *lv denied* 79 NY2d 1048). The court also properly determined that
> further admissions made by defendant to the police after he had exercised his right
> to counsel were not triggered by police conduct and, instead, were spontaneous
> (*see People v. Payne*, 233 AD2d 787, 788).

*People v. Linnen*, 309 A.D.2d at 1280. The claims raised in his *pro se* supplemental brief

contending that the Buffalo Police Department violated his constitutional rights by not recording

or taping his confession were summarily dismissed as "without merit" later in the same opinion.

*See id.*

For the reasons discussed below, I find that the state courts in Linnen's case properly applied the law and that their factual findings are supported by the record.

### a. Validity of Petitioner's Waiver of his *Miranda* Rights

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. In the context of custodial interrogation, "unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence." *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). After a defendant is advised of the *Miranda* warnings, "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. In addition to being knowing and intelligent, a defendant's waiver of his rights under *Miranda* must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

After making a determination that an accused has orally answered that he understood and wished to waive his *Miranda* rights, the Court must "make a case-by-case determination based upon the totality of the circumstances" as to whether the waiver was constitutionally sufficient. *United States v. Gaines*, 295 F.3d 293, 297-98 (2d Cir. 2002) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Tankleff v. Senkowski*, 135 F.3d 235, 244-45 (2d Cir.1998)). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Butler*, 441 U.S.

at 374-75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); citations omitted).

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *Butler*, 441 U.S. at 373. *See also*, *e.g.*, *United States v. Male Juvenile*, 121 F.3d 34 (2d Cir.1997); *Whitaker v. Meachum*, 123 F.3d 714, 716 (2d Cir.1997) (Although undisputed facts showed petitioner "refused to sign the [*Miranda*] waiver card" and that an officer "was the only witness to the alleged waiver," habeas denied.); *Nelson v. Walker*, 121 F.3d 828, 829-30, 835 (2d Cir.1997) (Denial of habeas petition affirmed and confession admissible where defendant "did not sign or initial any document indicating that he waived his *Miranda* rights."); *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir.1974) (Affirming district court's finding of *Miranda* waiver, as "[i]t is clear, in any event, that a written waiver is not required."); *United States v. Johnson*, 289 F. Supp.2d 151, 159-60 (D. Conn. 2003) ("The fact that the detectives did not read the *Miranda* rights aloud to [defendant], or ask him to initial next to each right, is not fatal in this context. . . . Having received the *Miranda* warnings, . . . [defendant's] decision to make an admission to [law enforcement], upon reflection, after initially asserting his right not to incriminate himself, constitutes a knowing and intelligent waiver of his rights.");*United States v. Miller*, 382 F.Supp.2d 350, 370 (N.D.N.Y. 2005); *United States v. Egipciaco*, 389 F. Supp.2d 520 (S.D.N.Y. 2005); *United States v. Cooper*, 95 Cr. 0031, 1995 WL 469702 at *4 (S.D.N.Y. Aug. 8, 1995) (No *Miranda* violation although defendant "objected to the officer taking notes of his confession." "[T]here may be several strategic reasons why a defendant willing to speak to police would still refuse to write out his answers to questions, or to sign a transcript of his answers prepared by the police . . . .") (citing *Connecticut*

*v. Barett*, 479 U.S. 523, 530 n. 4 (1987)).

At the suppression hearing, Detective Chella testified that upon their arrival at police headquarters about 2:20 p.m., he read the *Miranda* warnings to Linnen from a pre-printed card. According to Chella's testimony, which the suppression court credited, petitioner was alert and did not appear to be under the influence of illegal drugs or other medications. County Court Order Denying Suppression Motion at p. 4, Resp't Ex. at 174. Linnen stated that he understood his rights and told Chella, "I'll talk to you[,] man," which Chella wrote down *verbatim* on the pre-printed card. Linnen signed the card where Detective Chella placed an "X." Detective Chella testified that Linnen did not request an attorney at any time. Thus, there does not appear to be a factual dispute over whether the *Miranda* warnings were administered to petitioner before the interrogation, but rather a dispute about the effect of Linnen's signature on the pre-printed rights card. Linnen, on the other hand, testified that Detective Chella informed him that in order to trigger his right to speak with an attorney, he must place his signature on the pre-printed *Miranda* rights card. Thus, Linnen argues, that is why he signed his name next to the statement on the card regarding the right to counsel.

Linnen also testified at the suppression hearing that on the night of January 28, 1999, the police accused him of killing the decedent, and he then informed them orally that he would not speak to them any further without an attorney. *See* 10/29/99 Tr. at 18-25, 79-80. He essentially testified that when he signed his name on the *Miranda*-rights waiver card, he intentionally put the signature in the space on the card adjacent to the text indicating that one of the *Miranda* rights was the right to consult with an attorney. According to Linnen, his placement of his signature indicated that he *did* want to speak with a lawyer and was not waiving that right. Linnen further

asserted that the suppression court erred in rejecting his testimony that he asked to use the telephone in order to call a lawyer, that he did use the phone to call lawyers, that he "constantly" asked the police for a lawyer, that "he asked the police to leave him alone. *See* 10/29/99 Tr. at 21. Linnen argued that had the recording equipment been used, the videotape would have conclusively resolved, in his favor, the factual disputes presented by the suppression hearing testimony of himself and the police officers. *Id.* Linnen represents that he "is experienced in the law, with a number of years as a law clerk" at various correctional institutions, and based on that experience, it "countermands all common sense" to conclude that he would not ask for a lawyer. *Id.* at 27.

The credible testimony at the hearing established that Linnen's waiver was knowing and intelligent. This is especially so given Linnen's self-professed familiarity with the *Miranda* decision, *see* 10/29/99 Tr., at 4-7, 60, and his acknowledgment that he knew his rights, *id.* at 54, 60, 115, whether or not they were read to him. Not only did Detective Chella orally advise Linnen of his *Miranda* rights, but Linnen also read his rights from the advice-of-rights form. Petitioner clearly was above-average intelligence and, moreover, he had past personal experience with being read his rights, and he also stated that he had studied the *Miranda* decision as an inmate law clerk. His claim that he signed the *Miranda* warning card only to "activate" his right to an attorney or to prove that he asked for one is dubious. Moreover, a review of the rights warning card (Suppression Hearing Exhibit No. 1) supports Detective Chella's explanation that the location in which he had directed Linnen to sign was simply a function of the space available on the card.

Ultimately, this sort of inquiry merely presents a credibility issue decided against

petitioner at the suppression hearing. The trial court's findings were based upon an extensive development of the record by means of a suppression hearing involving the testimony of multiple witnesses, including Linnen. As such, the trial court's factual findings, including those regarding witness credibility, are entitled to a presumption of correctness which petitioner bears the burden of overcoming by clear and convincing evidence. *Nelson v. Walker*, 121 F.3d 828, 833-34 (2d Cir. 1997) (citations omitted); *United States v. Gaines*, 295 F.3d 293, 298 (2d Cir. 2002) ("Assessments of credibility of witnesses are the province of the district court.") (quoting *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir.1993)).  As noted above, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. at 373; *see also United States v. Durham*, 556 F. Supp.2d 141, 151 (N.D.N.Y. 2008) ("In the present Motion, Defendant raised a factual dispute: whether *Miranda* was administered and whether Defendant made a statement indicating a waiver of his rights. In his affidavit, Defendant makes the general claims he was not asked to, and did not, waive his *Miranda* rights. Defendant does not allege a specific circumstances that negates the validity of an oral waiver. Given that the Court has found that Defendant did orally state that he waived his *Miranda* rights, the Court is not required to examine whether the Government has proved the absence of every factual circumstance that could potentially negate a valid waiver."). Here, the record amply supports the trial court's factual findings and the conclusion that petitioner knowingly and voluntarily gave both an oral and written waiver of all of his *Miranda* rights to the police.

### b.  Voluntariness of Petitioner's Confession

"The police may use a defendant's confession [obtained during a custodial interrogation] without transgressing his Fifth Amendment right only when the decision to confess is the defendant's free choice." *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir.1991). The prosecution bears the burden of demonstrating by a preponderance of the evidence that a confession was voluntary. *See id.* at 99. "[T]he ultimate issue of voluntariness is a legal question requiring independent federal determination." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (internal quotation omitted). *Thompson v. Keohane*, 516 U.S. 99, 111 (1995) ("[T]he [Supreme] Court has ranked as [an] issue[ ] of law for § 2254(d) purposes: the voluntariness of a confession, . . . .") (citing *Miller v. Fenton*, 474 U.S. 104,116 (1985)). On the other hand, "subsidiary questions, such as the length and circumstances of [an] interrogation," or whether "the police engaged in the intimidation tactics alleged by the defendant," are entitled to the [statutory] presumption of correctness,", *id.* at 112[,]" accorded to the state court's factual findings. *Nelson v. Walker*, 121 F.3d at 833 (quoting *Miller v. Fenton*, 474 U.S. at 117); *accord, e.g.*, *Tankleff v. Senkowski*, 135 F.3d 235, 243 (2d Cir. 1998). A post-AEDPA habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence," 28 U.S.C. § 2254(e)(1).

"No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) (citing, *inter alia*, *Fare v. Michael C.*, 442 U.S. 707, 726 (1979)). "In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the

accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials. The relevant characteristics of the individual who confessed are the individual's experience and background, together with the suspect's youth and lack of education or intelligence." 850 F.2d at 901-02) (citing *Schneckloth v. Bustamonte*, 412 U.S. 213, 226 (1973)).

Whether a statement was involuntarily obtained depends upon the totality of the circumstances under which it was made. The credible testimony established that, under the totality of the circumstances, petitioner's confession was voluntarily, knowingly, and intelligently made. The interrogating police officer, Detective Chella, testified that petitioner answered his questions responsively, coherently, and calmly, and did not exhibit any confusion or lack of comprehension. When petitioner did show signs of becoming upset, the detectives backed off and allowed him to compose himself before continuing to question him. Petitioner was not handcuffed and did not suffer any physical deprivations; he was offered and given soda, cigarettes, and allowed to use the bathroom several times. Nor was he questioned for an excessively long time; the interrogation lasted a little over two hours. There was no coercive police presence when Linnen gave his confession; there were only two detectives in the room. No one ever yelled or raised his voice at defendant. In addition, there was nothing unusual about the interview room in which Linnen was questioned to suggest that the location itself was somehow inherently coerced. In sum, I can find no facts in the record from which I can discern or infer that petitioner was physically or psychologically coerced into making his oral statement to the police, confessing to the murder of John Watson. *See Colorado v. Connelly*, 479 U.S. 157,167, 170 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth

Amendment.").

Linnen maintains that his statements were made involuntarily because he was emotionally unstable. Although defendant suggests he was suffering from a weakened mental state, the prosecutor established through the testimony of the detectives that defendant was in touch with reality and able to freely and intelligibly communicate with the detectives. He also contends that he was incapable of voluntarily and knowingly making the inculpatory statements to Detective Chella because he had consumed alcohol and crack cocaine prior to the interrogation. He testified that he was intoxicated and high on crack at the time he spoke to the police, while the police officers testified that he did not exhibit any signs of intoxication or drug-use. Detective Chella testified, and the suppression court found as a fact that "defendant was alert and did not appear to be under the influence of drugs or medication. . . ." Even assuming that Linnen had taken alcohol or drugs before his interrogation, "the fact that he may have done so is not dispositive." *United States v. Wyche*, 307 F.Supp.2d 453, 463 (S.D.N.Y. 2004). Courts in this Circuit have held that "[a] statement may still be voluntarily given even when the speaker is intoxicated or under the influence of drugs, as there is no per se rule that a confession given under such circumstances is involuntary." *Id.* (citing *Avincola v. Stinson*, 60 F.Supp.2d 133, 160 (S.D.N.Y.1999)) (citing, inter alia, *United States v. Turner*, 157 F.3d 552, 555-56 (8th Cir. 1998)) (despite defendant being high on PCP, evidence showed that he understood his rights and knowingly waived them, and court declines to "adopt a *per se* rule . . . when confronted with intoxication"); *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir.) (statement was voluntary where drugs taken did not impair defendant's mental capacity), *cert. denied*, 525 U.S. 878 (1998); *United States v. Brooks*, 125 F.3d 484, 491 (7th Cir.1997) (statement voluntary despite claim that he was experiencing

effects of crack cocaine, sleep deprivation and a hand injury, he was alert, coherent and possessed capability of making informed and voluntary choices); *United States v. Christopher DiLorenzo*, 94 Cr. 303, 1995 WL 366377, at *8-9 (S.D.N.Y. June 19, 1995) (defendant knowingly and intelligently waived *Miranda* rights despite his claim that he was under the influence of alcohol, where he stated that he understood rights and signed form confirming that he understood); *United States v. Grant*, 427 F.Supp. 45, 50 (S.D.N.Y.1976) (statement voluntarily given by intoxicated defendant where "he was under control of his senses and fully understood the consequences of his statements," holding that "[c]onfessions given while under the influence of drugs are not per se involuntary confessions"). This Court's independent review of the hearing testimony does not convince it that Linnen was high on marijuana or crack, and that even if he was feeling some effects of his alleged drug use earlier that day, he was not so intoxicated as he now claims. Certainly, he was in enough control of his mental faculties to make it reasonable for the state courts to conclude that he was able to voluntarily waive his rights and speak to Detective Chella. Consequently, this ground of the petition alleging that his statement was involuntarily given and in violation of the Fifth Amendment does not warrant habeas relief.

        c.        **Admissibility of Petitioner's Statements to Police Following Petitioner's Request for Counsel and the Termination of Interrogation**

Linnen also challenges the admissibility of his remarks to Police Chief Riga, made after Linnen had requested an attorney and the interrogation had ceased. In *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the Supreme Court held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the

authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484-85 (footnote omitted). "Accordingly, once a suspect asserts his right under *Miranda* not to be questioned outside the presence of an attorney, 'statements made to the police must be spontaneous and not the result of interrogation.'" *United States v. Szymaniak*, 934 F.2d 434, 438 (2d Cir. 1991) (quoting *United States v. Colon*, 835 F.2d 27, 30 (2 Cir.1987), *cert. denied*, 485 U.S. 980 (1988)). The Supreme Court has held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (footnote omitted); *accord, e.g.*, *United States v. Szymaniak*, 934 F.2d at 439 (citing *United States v. Anderson*, 929 F.2d 96, 102 (2d Cir. 1991) (federal agent's misleading statements that suspect's invocation of right to counsel would permanently preclude him from cooperating with the police "contributed to the already coercive atmosphere inherent in custodial interrogation and rendered Anderson's first confession involuntary as a matter of law")).

As the suppression court found in Linnen's case, "[t]hese remarks were not in response to any questioning[,]" and "were not preceded by other conversation and were not otherwise solicited." Suppression Order at 5, R.176 (Dkt. #17-3). The suppression court correctly framed the issue as whether Linnen's admissions to Chief Riga following his invocation of the right to counsel was "triggered by police conduct which should reasonably have been anticipated to evoke a declaration from the defendant[.]" Suppression Order at 7, R.177 (Dkt. #17-3) . As the

state court observed, the issue "is not resolved by determining that the police harbored no subjective intent to elicit an incriminating remark but rather by whether an objective observer would conclude that the police conduct, in light of their knowledge of the defendant, was reasonably likely to provide a response[.]" *Id.* (citing *People v. Ferro*, 63 N.Y.2d 316, *cert. denied*, 472 U.S. 1007).

The state courts also properly determined that the statements Linnen made to detectives after he invoked his right to counsel were spontaneous and therefore admissible. Defendant told Chief Riga, "I didn't mean to kill that boy. I have a breaking point. Sometimes I just snap," and "He [i.e., decedent] tried to take my shit and throw me out of my house" (10/27/99, at 6-7). I agree with the state courts' conclusions that Linnen's statements were not the product of interrogation or its functional equivalent. Chief Riga "did not initiate any communication with the [petitioner]; his conduct represented an appropriate response to the [petitioner]'s request" to keep the matter "low profile[.]" Suppression Order at 7, R.177. Chief Riga commented simply that some of the information was a matter of public record and, after a short colloquy about the availability of protective custody for petitioner, left the room. *Compare with People v. Adams*, 244 A.D.2d 897, 899, 665 N.Y.S.2d 991, 993 (App. Div. 4th Dept. 1997) (When defendant asked a police detective whether the police could "do anything for him", the detective responded that he could not negotiate a deal but that he would inform the District Attorney that defendant was willing to cooperate. Defendant then implicated himself in two robberies. The statement of the detective "was not one that would be reasonably contemplated to elicit an incriminating response") (quotation omitted).

Here, the detectives asked no questions which might have invited the additional dialogue

and defendant's statements them were not even related to defendant's initial requests for protective custody. As the suppression court found, "[t]he context of this brief exchange did not inculpate the [petitioner], nor did it suggest that [petitioner]'s subsequent request to speak with Riga some five minutes later would result in an incriminating statement." Suppression Order at 7, R.177 (Dkt. #17-3). Indeed, it is "significant[ ]" that when Chief Riga "entered the room on this next occasion the [petitioner] immediately made the incriminating statement." *Id.* at 8, R.178 (citations omitted). I agree with the suppression court that the police chief's conduct "may not be viewed as 'subtly designed to elicit a statement', and he had no affirmative duty to prevent the [petitioner] from talking[.]" *Id.* (citations and quotations omitted). The record fully supports the suppression court's determination that the oral statements made by defendant to the police after he had invoked his right to counsel were spontaneous and not the result of police interrogation or its functional equivalent. *Id.*

**2.    Violation of Due Process Resulting from Failure of Police to Videotape Confession (Petitioner's Issues 12 & 22)**

"Issue 12:    Whether the failure of the Buffalo Police Department to use its interrogation room recording equipment . . . deprived the [petitioner] of his constitutional rights to a fair trial, due process of law, right to counsel, and protections against self-incrimination."

"Issue 22:    Was the defendant denied the State and Federal constitutional rights to due process, protection against self-incrimination, assistance of counsel, right to objective review, and fundamental liberty protection – implicit in both the state and federal constitution – due to the deliberate and calculated failure of the Buffalo homicide detectives to follow their own mandatory procedures regarding suspect interviews."

Petitioner argued in his *pro se* brief on direct appeal that he was denied his "state and

federal constitutional rights to due process, protection against self-incrimination, assistance of counsel, right to objective review, and fundamental liberty protections . . . due to the deliberate and calculated failure of the Buffalo Homicide detectives to follow their own mandatory procedures regarding suspect interviews . . . ." Petitioner's *Pro Se* Appellate Brief ("Pet'r *Pro Se* App. Br." at 14), Resp't Ex. B. Linnen has submitted in support of this claim a Buffalo Police Department internal policy document titled, "GUIDELINES VIDEO/AUDIOTAPING OF SUSPECT INTERVIEWS," *see* Appendix to Petitioner's *Pro Se* Supplemental Appellate Brief, Resp't Ex. B.  Linnen asserts that this document "mandat[ed] procedures that would allow for the recording of suspect interviews" and that the police failed to substantially comply with the guideline because "[t]he police never asked the defendant if he wanted the session taped" Pet'r *Pro Se* App. Br." at 16, 17, Resp't Ex. B.

Linnen has not asserted an error of New York state case law or the New York state constitution. *E.g.*, *People v. Kunz*, 31 A.D.3d 1191, 817 N.Y.S.2d 824, 824 (App. Div. 4th Dept. 2006) (holding that the trial court "properly refused to suppress statements made by defendant to the police on the ground that the interrogation resulting in those statements was not electronically recorded" since "'[t]here is no Federal or State due process requirement that interrogations and confessions be electronically recorded'") (quoting *People v. Falkenstein*, 288 A.D.2d 922, 923, 732 N.Y.S.2d 817 (App. Div. 4th Dept. 2001), *lv. denied*, 97 N.Y.2d 704 (N.Y. 2002); other citations omitted)).

Most important for purposes of this habeas proceeding, Linnen has pointed to no federal precedent standing for the proposition that the failure to videotape police interrogations violates

any right guaranteed under the United States Constitution.[5] Federal habeas corpus relief will not

lie to rectify errors of state constitutional, statutory, or procedural law unless a federal

constitutional issue is also presented. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (A

federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws,

or treaties of the United States;" it is not the province of a federal habeas court to re-examine

state court determinations of state law.).  To the contrary, several circuit courts have concluded

that the federal Constitution does not obligate police officers to record interrogations or

confessions. *E.g.*, *Ridgley v. Pugh*, 176 F.3d 484 (9th Cir.1999) (habeas claim based on police

officer's failure to tape-record a portion of petitioner's interrogation "does not state a violation of

a federal constitutional or statutory right"); *United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir.

1988) (finding "no constitutional requirement to record confessions by any particular means,"

including videotaping, even if such equipment is available); *Reinert v. Larkins*, 379 F.3d 76, 94

n.4 (3d Cir. 2004) ("Reinert urges us to follow the example of the Supreme Courts of Minnesota

and Alaska and rule that, in the absence of an electronic record of the custodial interrogation in

the hospital (by either audiotape or videotape), we should suppress the confession as a violation

of the Fifth Amendment, Sixth Amendment, protections of due process, protection against

self-incrimination, and provisions for effective assistance of counsel and confrontation. *See State

v. Scales*, 518 N.W.2d 587 (Minn.1994) (holding that custodial interrogations must be recorded

where feasible); *Stephan v. State*, 711 P.2d 1156 (Alaska 1985) (holding that non-recorded

statements made during the course of a custodial interrogation should be suppressed because they

---

[5]     The only Supreme Court case that Linnen cites in support of his argument, *United States v. Gaubert*, 499 U.S. 315 (1991), is wholly inapposite; it deals with liability of government employees under the Federal Tort Claims Act. *See id.* at 324.

were obtained in violation of the Due Process Clause of the Alaska Constitution). While the

advocated policy may be a desirable one, Reinert can point to no Pennsylvania law supporting it;

indeed there is none. Even if there were such a rule announced in Pennsylvania, we, as a federal

court sitting in habeas jurisdiction, would not have the authority to review a violation of the state

constitution. It therefore goes without saying that, given that there is no right to recorded

custodial interrogations under Pennsylvania law, we are certainly not at liberty to create one.

Insofar as Reinert invokes the Fifth and Sixth Amendments of the Federal Constitution, he

invokes a purported federal right to have a custodial interrogation recorded. He does not,

however, cite any authority for this proposition; again there is none. We will, at this juncture,

decline to infer a federal right to have custodial interrogations recorded."); *United States v.

Zamudio*, No. 99-2256, 2000 WL 488474, at *2 (10th Cir. Apr. 26, 2000) (unpublished decision)

(upholding the district court's conclusions that the Fifth Amendment does not require the

recording of post-arrest statements, and that the absence of a tape recording did not constitute a

due process violation) (citing *United States v. Yunis*, 859 F.2d at 961 ("[T]there is no

constitutional requirement that confessions be recorded by any particular means.")); *United

States v. Toscano-Padilla*, No. 92-30247 996 F.2d 1229, 1993 WL 210793 (9th Cir. June 16,

1993) ("We decline to hold, as appellant apparently encourages, that a failure by law enforcement

officials to record an interrogation violates due process and automatically mandates suppression.

Also, while we would certainly recommend officials take extemporaneous notes during

questioning, a failure to do so certainly does not invalidate the information gained from the

interrogation. Whether such a failure undermines the accuracy and credibility of later testimony

is an issue uniquely for the finder of fact.") (footnote omitted); *United States v. Coades*, 549 F.2d

1303, 1305 (9th Cir. 1977) ("Appellant contends that testimony of an FBI agent that appellant confessed to the crime charged should have been suppressed because the interrogation was not recorded electronically or stenographically. Appellant recognizes the lack of authority for his position but urges that we adopt it to insure reliability of police reports of oral confessions during custodial interrogation. . . .The need for the rule suggested by appellant and the particular form such a rule should take are appropriate matters for consideration by Congress, not for a court exercising an appellate function.").

Finally, even accepting as true Linnen's claim that the police department violated its internal policy guidelines, this alone does not warrant habeas relief. *See Cotz v. Mastroeni*, 476 F. Supp.2d 332, 373 n.44 (S.D.N.Y. 2007) ("Plaintiff also appears to claim that the Ramapo Police Department violated her constitutional rights when they sent officers to take Weidel's statement after this confrontation prior to sending someone to plaintiff's residence when, in fact, plaintiff called the police first. Plaintiff emphasizes that this constituted a violation of the Ramapo Police Department's policy. Even if this does in fact constitute a violation of internal policy, it does not give rise to a cognizable claim pursuant to [42 U.S.C.] § 1983.") (citing *United States v. Caceres*, 440 U.S. 741, 749-57 (1979) (holding that failure of IRS agent to follow IRS electronic surveillance regulations before recording conversations between taxpayer and agent did not require suppression of tape recordings in prosecution of taxpayer accused of bribing IRS agent; since IRS was not required by Constitution to adopt its regulations governing electronic surveillance, violation of agency regulations did not raise constitutional questions).

**3.      Denial of Sixth Amendment Right to Effective Assistance of Trial Counsel**

        **a.      General Legal Principles**

Petitioner asserts numerous errors on the part of trial counsel which he claims

demonstrate that counsel failed to provide constitutionally effective representation as guaranteed

by the Sixth Amendment and measured by the by-now familiar standard described in *Strickland v*

*Washington*, 466 U.S. 668 (1986): A convicted defendant's claim that counsel's assistance was

so defective as to require reversal of a conviction or death sentence has two components. First,

the defendant must show that counsel's performance was deficient. This requires showing that

counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the

defendant by the Sixth Amendment. Second, the defendant must show that the deficient

performance prejudiced the defense. This requires showing that counsel's errors were so serious

as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant

makes both showings, it cannot be said that the conviction or death sentence resulted from a

breakdown in the adversary process that renders the result unreliable. "[T]here is no reason for a

court deciding an ineffective assistance claim . . . to address both components of the inquiry if

the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### b.      Alleged Instances of Trial Counsel's Ineffectiveness

Issue 5, as framed by in Linnen in his habeas petition, appears to encompass most of the

numerous grounds of ineffective assistance of trial counsel that he advanced in the state courts

both on direct appeal and in his collateral attacks on the conviction.

> "Issue 5:      Whether the [petitioner] was denied his Federal constitutional
> rights to the effective assistance of counsel . . . . by the failure of
> his assigned counsel to independently investigate and test the
> indictment . . . ."

First, on direct appeal, appellate counsel argued that trial counsel was ineffective in

agreeing to stipulate to Raychell Smith's testimony regarding when she had last seen the decedent alive; and failed to retain an expert witness in support of the "extreme emotional disturbance" defense. *See* Petitioner's Appellate Brief ("Pet'r App. Br.") at 45-49.

In his *pro se* supplemental brief on direct appeal, Linnen asserted that trial counsel was ineffective because he "failed to object to the introduction of alleged prior bad acts of the defendant introduced by the people's direct case; he failed to object to the prosecutor's prejudicial summation; and he failed to remove a grossly unqualified juror from the jury." Petitioner's *Pro Se* Supplemental Appellate Brief ("Pet'r *Pro Se* Supp. App. Br.") at 30.

The Appellate Division summarily rejected all of these ineffective assistance of trial counsel on direct appeal holding that "[c]ontrary to the further contentions of defendant, he was not denied effective assistance of counsel (*see People v Baldi*, 54 NY2d 137, 147 [1981])]." *People v. Linnen*, 309 A.D.2d at 1081.

Next, in his C.P.L. § 440.10 collateral motion to vacate the judgment, Linnen broadly claimed that his trial counsel, "in order to be minimumly [sic] effect" was required to "(1) hire a private investigator, (2) visit the client in jail, (3) visit the crime scene, and (4) hire experts to test the evidence." Petitioner's C.P.L. § 440.10 Motion at page 13. (Linnen does admit that trial counsel visited him prior to trial.) Linnen also repeated the claim raised by appellate counsel on direct appeal–that trial counsel erred in his handling of the evidentiary stipulation concerning witness Raykell Smith. In addition, Linnen claimed in his C.P.L. § 440.10 motion that that trial counsel failed to sufficiently prepare to cross-examine Valerie Hammett. Linnen asserted that trial counsel was ineffective in failing to call certain witnesses, Marcia Rice and Richard Hatten to testify for the defense, and purportedly establish an alibi for him.

## I.    Erroneous Stipulation Regarding Raychell Smith's Testimony

Linnen claims trial counsel was ineffective for failing to interview prosecution witnesses Raychell Smith and then stipulating to introducing at trial Smith's prior testimony that she saw last saw the victim alive on Tuesday, January 19, 1999, and again later that night, leaving her house at about 8:50 p.m. after receiving a call on his pager. T.1119-20. Smith did not see the decedent after the evening of January 19, 1999. The prosecution, according to petitioner, adduced no other evidence that decedent was alive on January 19, 1999, except by means of Smith's stipulated testimony. Pet'r App. Br. at 45. Asserting that "[n]o evidence supported the stipulation," petitioner's appellate counsel "wonder[ed] as to defense counsel's wisdom in agreeing to the stipulation . . . ." Pet'r App. Br. at 45-46.

"[T]rial decisions to offer or stipulate to certain evidence . . . are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (internal quotations omitted); *Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir.1997) (identifying "'what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed'" as matters that "'primarily involve trial strategy and tactics'") (quoting *United States v. Teague*, 953 F.2d 1525, 1531 (11th Cir.1 992) (*en banc*)). "Experienced defense attorneys routinely stipulate to undisputed facts in order to maintain credibility with the jury when challenging other aspects of the prosecution case." *United States v. Gaskin*,  364 F.3d 438, 469 (2d Cir. 2004).

I agree with the C.P.L. § 440.10 court that Linnen "has not demonstrated that his defense would have benefitted from . . . counsel's interviewing Raykell Smith."  C.P.L. § 440.10 Order at

2.  As with Linnen's generalized complaints about counsel's failure to investigate, Linnen's allegations with regard to trial counsel's handling of Smith as a witness, do not demonstrate even a possibility that the outcome of his trial would have been different but for this omission by counsel. Therefore, he cannot establish prejudice. *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir.2002) ("Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature and generally will not support an ineffective assistance claim.") (internal quotation marks omitted); *United States v. Jordan*, 591 F. Supp.2d 686, 713 (S.D.N.Y. 2008) ("Jordan has also failed to show that he was prejudiced by the purported failure to consider this unidentified line of cross-examination. Jordan's complaint seems to be that the stipulation was damaging to him. But the choice was not between the stipulation and nothing at all; it was between the limited stipulation and Ms. Foss's live testimony, with the very substantial risk that that testimony would have been far more damaging to Jordan. Thus, the defendant's claim of ineffective assistance of counsel on the basis of the stipulation is denied.").

### ii.    Failure to Adequately Cross-Examine Valerie Hammett

The C.P.L. § 440.10 court found that "[s]ufficient facts appear in the record to have allowed the Appellate Division to determine the adequacy of counsel's preparation for trial with specific reference to the cross-examination with regard to Valerie Hammett."  C.P.L. § 440.10 Order at 2 (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c)). In so ruling, the state court found the claim procedurally barred, pursuant to C.P.L. § 440.10(2)(c), because the trial record permitted Linnen to raise this claim on direct appeal, but he failed to do so. "Where the basis for a claim of ineffective assistance of counsel is well established in the trial record," as was the case here, "a state court's reliance on subsection [440.10](2)(c) provides an independent and adequate

procedural bar to federal habeas review." *Murden v. Artuz*, 497 F.3d 178, 196 (2d Cir. 2007)

(citing *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003)); *Rowe v. People of State of New York*,

No. 99CIV12281GELRLE, 2001 WL 1606744, at *4 (S.D.N.Y. Dec. 12, 2001) ("On direct

appeal, Rowe did not raise ineffective cross-examination in his ineffective assistance of counsel

claim. The evidence of this claim is contained in the record, and therefore, it should have been

raised on direct review. Because the appealable claim was not raised on direct review, it is

collaterally barred pursuant to New York Criminal Procedural Law § 440.10(2)(c), and Rowe has

procedurally defaulted.").  Because Linnen has not presented any evidence to demonstrate cause

or prejudice for the default, or that a fundamental miscarriage of justice would result from his

default, further habeas review of this contention is unavailable.

### iii.     Failure to Call Witnesses for the Defense

Linnen asserts that trial counsel was ineffective in failing to call witnesses Marcia Rice

and Richard Hatten to testify for the defense and purportedly establish an alibi for him.

According to Linnen, Rice would have testified that she was with petitioner at the time that Gwen

Mitchell claimed that she saw petitioner "hanging out of his apartment window, and then going to

[Mitchell's] house to allegedly borrow items that were allegedly later found at the crime scene."

Pet'r C.P.L. § 440.10 Motion at 17. According to petitioner, Hatten would have testified that

petitioner was away from Buffalo, soliciting contacts for legitimate business venture, during the

week that decedent went missing and was found dead. The C.P.L. § 440 court rejected these

claim, holding that "defendant has not presented affidavits from Richard Hatten or Marcia Rice or

the records alleged to be exculpatory." C.P.L. § 440.10 Motion at 2. As the motion court found,

the claims pertaining to Rice and Hatten are based only on Linnen's unsubstantiated allegations.

Linnen's allegations in this regard were, and are, based upon mere speculation, unsupported by any affidavits from these witnesses. As such, I agree with the C.P.L. § 440.10 court that Linnen failed to demonstrate how "his defense would have benefitted" from counsel's calling these individuals in his defense.  C.P.L. § 440.10 Order at 2. Because Linnen has failed to demonstrate even a possibility that the outcome of his trial would have been different but for this omission by counsel, he cannot establish prejudice.

iv.    **Failure to Visit the Crime Scene, Retain Private Investigator, and Retain Unspecified Expert Witness**

Linnen did not specify in his C.P.L. § 440.10 motion what type of expert with whom trial counsel should have consulted and retained for purposes of "investigating and testing the evidence" against him. As with his claims pertaining to purported defense witnesses Rice and Hatten, these claims concerning the failure to investigate are upon mere speculation, unsupported by any affidavits of potential investigators or expert witnesses. As such, I agree with the C.P.L. § 440.10 court that Linnen failed to demonstrate how "his defense would have benefitted from counsel's visiting any of the locations relevant to the homicide, the retention of a private investigator and/or expert . . . ."  C.P.L. § 440.10 Order at 2.   Because Linnen has failed to demonstrate even a possibility that the outcome of his trial would have been different but for this omission by counsel, he cannot establish prejudice.

v.    **Failure to Consult Expert Psychiatric Witness Regarding EED Defense**

On direct appeal, petitioner's appellate counsel criticized defense counsel's presentation of factually inconsistent defenses. Appellate counsel argued that defense counsel should have opted solely for the EED defense. Appellate counsel stated that based on his statements to Detective

Chella, it appears that petitioner was "seeing both a counselor and psychiatrist; had been prescribed Prozac and Wellbutrin; had been diagnosed with a compulsive disorder of some sort; had not taken his medication for some weeks prior to the decedent's death and had apparently been using illicit drugs heavily within recent weeks." Appellate counsel argued that jury was deprived of psychiatric "expert testimony tying this information together in a way that would explain the emotional disturbance defense that the appellant was seeking to establish." Pet'r App. Br. at 48-49. Linnen did not raise this claim regarding trial counsel's failure to retain an expert witness in his *pro se* supplemental appellate brief. The Appellate Division summarily rejected claim pertaining the failure to call an expert witness in its summary holding that Linnen received the effective assistance of trial counsel under the *People v. Baldi* standard.

Interestingly, Linnen did not pursue this claim very vigorously in his C.P.L. § 440.10 motion. In fact, he apparently disagreed with trial counsel's strategy of using the EED defense at all. Linnen stated that trial counsel "put in two unauthorized defenses (Extreme Emotional Disturbance and Self Defense)" without his permission, noting that both defenses "required proof from the defendant" and "[n]one was provided by defense counsel to support these defenses," and that, in any event, "defendant told assigned-counsel time and time again that he was not involved with the crime." Pet'r C.P.L. § 440.10 Motion at 20. Linnen, throughout the proceeding, has insisted that he did not kill the decedent, leading counsel to argue in his opening that someone, other than petitioner, killed Watson. T.107-11. (Indeed, in a letter to his mental health counselor, Gwen Herbert, dated June 2000, Linnen insisted vehemently that he had nothing to do with the murder.) The C.P.L. § 440.10 court noted that "[i]n affirming the conviction the Appellate Division . . . rejected defendant's claim of ineffective assistance of counsel, including the specific

allegation that counsel neglected to obtain an expert supporting the affirmative defense of extreme emotional disturbance." C.P.L. § 440.10 Order at 2 (citation to record omitted). Later in that paragraph, the trial court states, "This branch of the motion [alleging ineffective assistance of counsel] is therefore denied (CPL 440.10(2)(a), (c); CPL 440.30(4)(b))." *Id.*

"[I]n general, whether or not to hire an expert is the type of strategic choice by counsel that may not be second-guessed on habeas corpus review." *Murden v. Artuz*, 253 F. Supp.2d 376, 389 (E.D.N.Y. 2001) (citing *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to 'whether to call specific witnesses–even ones that might offer exculpatory evidence–is ordinarily not viewed as a lapse in professional representation.'") (citations omitted), *cert. denied*, 532 U.S. 1007 (2001); *Strickland*, 466 U.S. at 689 (actions or omissions by counsel that "might be considered sound trial strategy" do not constitute ineffective assistance) (citations omitted)), *aff'd*, 497 F.3d 178 (2d Cir. 2007).[6]

In *Murden v. Artuz*,497 F.3d 178, the Second Circuit considered the contentions of a habeas petitioner convicted of murder that his trial counsel was ineffective in failing to consult with him regarding defense based upon extreme emotional disturbance (EED), interview witnesses for that defense, and explore petitioner's attempted suicide some four years prior to murder. The case came before the Circuit on a certificate of appealability after the district court had denied petitioner Murden's claim of ineffective assistance of counsel based upon counsel's failure to more fully investigate the EED defense. (At trial, Murden's counsel, after arguing only

---

[6]        *But see Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001) (failure to call medical expert in sexual abuse case considered cumulatively with other errors constituted ineffective assistance); *Lindstadt v. Keane*, 239 F.3d 191, 199-205 (2d Cir. 2001) (same)); *Eze v. Senkowski*, 321 F.3d 110, 136 (2d Cir. 2003) (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for . . . counsel's decisions" not to, among other things, consult with an expert medical witness in a child sexual abuse case).

the theory of self-defense in his opening statement, then chose to pursue both defenses.). Although the claim that trial counsel had failed to investigate fully the EED defense was "not without some basis," and that it was possible that he should have pursued that defense instead of a justification defense, the district court found that Murden was unable to show prejudice.[7] The Second Circuit held that the state court had not unreasonably applied *Strickland* when it rejected Murden's claim that trial counsel was ineffective in failing to further pursue EED defense, given that justification defense pursued by counsel was consistent with Murden's description of events surrounding murder, and that evidence proffered in support of EED defense did not create reasonable probability that defendant would have prevailed on that defense. *Murden*, 497 F.3d at 198.

The Second Circuit found that it "was entirely reasonable for Murden's counsel to pursue as Murden's primary defense the claim that Murden had killed Miles [his girlfriend] in self-defense[,]" since "[t]he justification defense was consistent with Murden's description of the events that led to Miles's murder." *Id.*[8] Similar to the facts in *Murden*, Linnen described a fight

_____

[7]     The district court in *Murden* found that although trial counsel "did not have a winner" with self-defense, he "had a loser with EED," because Murden's psychiatric records "would have revealed petitioner to the jury as a violently jealous man, possessed by a kind of homicidal jealousy directed at least [at] one other person in addition to this victim." *Murden*, 497 F.3d at 190 (quoting district court opinion). Furthermore, the psychiatric testimony based on Murden's attempted suicide following an intense argument with a prior girlfriend would not have established the objective element of the EED defense since there was no reasonable explanation for an extreme emotional disturbance, as the Appellate Division had already held in rejecting Murden's direct appeal from his conviction. *Id.* Because Murden testified at trial that he acted in self-defense, district court found that he could not fault trial counsel for failing to pursue a factually incompatible theory. *Id.* Finally, the district court concluded, the proffered testimony from the uncalled witnesses regarding the EED defense  would not have helped Murden to obtain an acquittal. *Id.*

[8]     The Second Circuit observed, "Murden did not describe lashing out after Miles rebuffed his request for a kiss. He did not assert that he killed her because he suddenly feared that he would lose her or his apartment. Instead, he described striking out only after and in reaction to Miles's attacking him with a knife and others attacking him from behind. Even the Preston affidavit, which Murden offered with his first Section 440 motion, corroborated the justification defense. According to Preston, on the Saturday night of the murder Murden reported that he had been attacked and had acted to defend himself.  It is of course permissible as a legal matter for an attorney to pursue alternative and even factually inconsistent defenses, but as a practical matter, it is difficult for Murden to show that he was prejudiced by his counsel's failure to develop the EED defense further at trial. Murden

instigated by "Baby John", the decedent. Linnen told the police, "'Baby John' . . . began choking me in my house. . . . I was coming in and out" of consciousness." The decedent was "calling him a crackhead, telling him that he was never going to change[,]" and that he was "taking over" petitioner's house to use as a place to sell his drugs. Linnen claimed that he asked "Baby John" to "please get off him," prompting decedent to retort that he "had killed 17 motherfuckers; do you think one more crackhead is going to matter?" According to Linnen, "Baby John" "grabbed [him] in a chokehold and pushed his back up against the wall." T.406. While he was confessing to Detective Chella, petitioner got up from the table and demonstrated these actions he was describing.

Based upon these the admissions which Linnen made to Detective Chella in his confession. During Linnen's trial, defense counsel developed theories of both self-defense and extreme emotional disturbance T.1304, 1308. "It is of course permissible as a legal matter for an attorney to pursue alternative and even factually inconsistent defenses[,]" *Murden v. Artuz*, 497 F.3d at 198. Defense counsel, based solely on the proof adduced at trial, was able to obtain jury instructions on both the defense of justification (self-defense), N.Y. PENAL LAW § 35.15, and the defense of extreme emotional disturbance, which is a partial affirmative defense to second degree (intentional) murder, N.Y. PENAL LAW § 125.25(1)(a)[9]; *see also People v. White*, 79 N.Y.2d 900,

---

argues that, had his counsel been effective, he could have established that Murden was predisposed to emotional disturbance based upon troubles with girlfriends and that the taunting by Miles and her family, Miles's threats to kick him out of his apartment, and her refusal to let him sleep with her on Friday night provoked an extreme emotional disturbance that caused Murden to kill Miles. Murden's trial testimony did not support the asserted EED defense, however, and was in fact inconsistent with it." *Murden v. Artuz*, 497 F.3d at 198.

[9]        One count of the indictment charged Linnen with second degree (intentional) murder under Penal Law § 125.25(1). This section provides in pertinent part as follows:

A person is guilty of murder in the second degree when:

581 N.Y.S.2d 651, 652, 590 N.E.2d 236, 237 (N.Y. 1992); *People v. Moye*, 66 N.Y.2d 887, 498

N.Y.S.2d 767, 769, 489 N.E.2d 736, 737-38 (N.Y. 1985) (cited in *DeLuca v. Lord*, 77 F.3d 578,

585 (2d Cir. 1996) (discussing New York case law on EED)).

      The affirmative defense of extreme emotional disturbance is addressed in N.Y. Penal Law

§ 125.25(1)(a) and § 125.20(2), which define the elements of murder in the second degree and

manslaughter in the first degree. Read in tandem, these statutes provide that a defendant who

proves by a preponderance of the evidence that he or she committed a homicide while "under the

influence of extreme emotional disturbance for which there was a reasonable explanation or

excuse" is guilty of manslaughter and not murder. *People v. Roche*, 98 N.Y.2d 70, 75 (N.Y.

2002). The effect of a successful EED defense does not lead to acquittal, but reduces the crime

upon conviction from murder to manslaughter in the first degree. N.Y. PENAL LAW § 125.25(1)(a);

*see also People v. Casassa*, 427 N.Y.S.2d at 772-73; *DeLuca v. Lord*, 77 F.3d at 585. The EED

defense "'defense allows a defendant charged with the commission of acts which would otherwise

constitute murder to demonstrate the existence of mitigating factors which indicate that, although

[ ] not free from responsibility for [the] crime, [defendant] ought to be punished less severely[.]'"

*Id.* (quoting *People v. Casassa*, 49 N.Y.2d at 675).

      Notably, "[p]sychiatric evidence is not necessary to establish the defense." *People v.*

---

1. With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution under this subdivision, it is an affirmative defense that:

(a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. Nothing contained in this paragraph shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime . . . .

N.Y. PENAL LAW § 125.25(1)(a).

*Moye*, 66 N.Y.2d at 890 (citing *Matter of Lee v. County Ct.*, 27 N.Y.2d 432, 442, 318 N.Y.S.2d 705, 267 N.E.2d 452).[10] Such testimony is not "essential or controlling, and the trier of fact may reject the defense even where the prosecution offers no expert testimony to rebut it." *People v. Shelton*, 88 Misc.2d 136, 145, 385 N.Y.S.2d 708, 715 (N.Y. Sup. Ct. 1976) (citing *People v. Solari*, 43 A.D.2d 610, 349 N.Y.S.2d 31 (App. Div. 3d Dept. 1973)*, aff'd,* 35 N.Y.2d 876 (N.Y. 1974); *People v. Patterson*, 383 N.Y.S.2d at 582). The defense of extreme emotional disturbance requires the defendant to produce "evidence that he or she suffered from a mental infirmity not rising to the level of insanity at the time of the homicide, typically manifested by a *loss of self-control*." *People v. Smith*, 1 N.Y.3d 610, 776 N.Y.S.2d 198, 199, 808 N.E.2d 333 (N.Y. 2004) (emphasis supplied); *People v. White*, 79 N.Y.2d at 904. The EED defense's subjective element "focuses on the defendant's state of mind" and is "generally associated with a loss of self-control." *People v. Harris*, 740 N.E.2d at 229; *see also Roche*, 98 N.Y.2d at 75, 745 N.Y.S.2d 775, 772 N.E.2d 1133.

The "mental infirmity" is the subjective element; the objective element is whether there was a reasonable explanation or excuse for the emotional disturbance." *Id.*; *see also Rice v. Hoke*, 846 F.2d 160, 166 (2d Cir. 1984) (discussing New York's law on the defense of extreme emotional disturbance); *People v. Casassa*, 49 N.Y.2d 668, 679 (N.Y. 1980) ("The first requirement is wholly subjective i.e., it involves a determination that the particular defendant did in fact act under extreme emotional disturbance, that the claimed explanation as to the cause of his

---

[10]     Indeed, during the early years of the statute, there was "some confusion as to whether psychiatric testimony is admissible on the issue of 'extreme emotional disturbance' (*see*, *e.g.*, ruling in *People v. Chi Yung Lau*, N.Y. County, Indictment No. 3214-74, denying admissibility) the language of Patterson at least implies that such testimony is relevant and material and not otherwise inadmissible (Justice Rosenberger's opinion in *People v. Williams*, N.Y.L.J., May 5, 1976, p. 8, col. 6, provides a thorough discussion of this issue).

action is not contrived or sham." ). "The subjective element focuses on the defendant's state of mind at the time of the crime and requires sufficient evidence that the defendant's conduct was actually influenced by an extreme emotional disturbance." *People v. Harris*, 95 N.Y.2d 316, 319 (N.Y. 2000).

The courts have not fixed with precision the contours of what constitutes a "mental infirmity", much less, what exactly is an "extreme emotional disturbance" for purposes of establishing the EED defense. In *People v. Walker*, 64 N.Y.2d 741 (N.Y.), for instance, the New York Court of Appeals held,

> At most, the evidence at trial showed that the defendant acted out of anger or embarrassment, or both. While these emotions might sometimes serve as the 'reasonable explanation' for the presence of 'extreme emotional disturbance' they are not equivalent to the loss of self-control generally associated with that defense, and are not necessarily indicative of the 'mental infirmity', not rising to the level of insanity, discussed in *People v. Patterson*, 39 N.Y.2d 288, 302, 383 N.Y.S.2d 573, 347 N.E.2d 898, *affd.*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281).").

*Walker*, 64 N.Y.2d at 743. Although the New York Court of Appeals in *Patterson* recognized that "extreme emotional disturbance" as contemplated by the statute is a lesser form of mental infirmity than insanity, the court did not hold that all mental infirmities not arising to the level of insanity constitute "extreme emotional disturbance" within the meaning of the statute." *People v. Casassa*, 49 N.Y.2d at 677. Thus, *People v. Patterson*, 39 N.Y.2d at 302, should not be read "as holding that all mental infirmity, short of insanity, must constitute 'extreme emotional disturbance' if such infirmity causes the defendant to become emotionally disturbed and the defendant subjectively believed his disturbance had a reasonable explanation or excuse." *Id.* (holding that *People v. Patterson*, 39 N.Y.2d 288, does not require that reasonableness be tested

with a completely subjective standard, i.e., from solely the defendant's point of view).

I find it noteworthy that Linnen, in his *pro se* applications, has never introduced any of his medical records regarding any psychiatric or mental health-related treatment he may have received in the past. *See Murden v. Artuz*, 253 F. Supp.2d 376, 389 (E.D.N.Y. 2001) (declining to second-guess trial counsel's decision not to hire an expert on habeas corpus review where petitioner provided no affidavits or evidence that an expert witness would have provided the desired testimony) (cited with approval by *United States v. Akwuba,* No. 01 CIV.3057 (SWK)(FM), 2005 WL 2249775, at *16 (S.D.N.Y. Apr. 26, 2005) ("Moreover, to the extent that Akwuba faults his counsel for failing to call Dr. Juncal or another expert, he has failed to proffer any evidence that the expert would have offered admissible testimony. Akwuba consequently is not entitled to any relief on the basis of his counsel's failure to call an expert.")).

Even assuming that an expert psychiatrist existed who would have testified that Linnen had a mental health diagnosis for which he was prescribed Wellbutrin and Prozac, the subjective element of EED also requires a concomitant a loss of self control. *E.g.*, *People v. Moye*, 66 N.Y.2d at 890. In other words, the loss of self control appears to be the crux of the subjective, "mental infirmity" aspect of the EED defense. In determining whether a petitioner has acted out of a loss of self control, the court will look at the petitioner's conduct before and after the homicide. *E.g.*, *People v. Dominguez*, 640 N.Y.S.2d 583, 583-84 (App. Div.1996); *People v. Feris*, 535 N.Y.S.2d 17, 18 (App.Div.1988). For example, in *Dominguez*, the court found that, although the petitioner claimed to be frightened at the time he shot the victim, his actions after the shooting were inconsistent with the loss of self control associated with the defense of extreme emotional disturbance. 640 N.Y.S.2d at 583-84. In that case, the defendant fled the scene of the shooting,

disposed of the murder weapon, consciously decided not to return home, and fled the state the following day. *Id.* The court found, under such circumstances, an instruction on extreme emotional disturbance was not warranted because there was insufficient evidence to support such a finding. *Id.*

Acting out of anger or embarrassment is "not equivalent to the loss of self control generally associated with" the defense of extreme emotional disturbance. *People v. Walker*, 64 N.Y.2d 741, 743 (N.Y.1984); *People v. Gonzalez*, 670 N.Y.S.2d 849, 849 (N.Y.App.Div.1998) (finding that, although victim insulted defendant, defendant's resulting anger and embarrassment were not equivalent to loss of self control); *Rice v. Hoke*, 846 F.2d. at 166 ("the proof showed only that Rice was angry" and "[a]nger alone . . . does not amount to a mental infirmity or the loss of self-control associated with the defense of extreme emotional disturbance."). In *Rice,* the defendant and the victim argued and exchanged punches after the victim insulted the defendant's wife. After the fight, the defendant left the scene and returned a few minutes later with a gun. *Rice*, 846 F.2d at 162-63. He fired five shots at the victim, who died later that day of his wounds. *Id.* The trial judge declined to charge the jury with extreme emotional disturbance because "there was no reasonable view of the evidence" to support such a charge. *Id.* at 162-63. *See also People v. Felix*, 232 A.D.2d 228, 229, 648 N.Y.S.2d 87, 88 (App. Div. 1st Dept. 1996) (charging the affirmative defense would have invited the jury to speculate impermissibly as to defendant's state of mind at the time of the shooting because the evidence showed, at most, that he acted out of anger or embarrassment at being rejected by the victim, emotions "not equivalent to the loss of self-control generally associated with that defense") (citations omitted), *People v. Checo*, 194 A.D.2d 410, 599 N.Y.S.2d 244, 244 (App. Div. 1st Dept. 1993) ("Defendant failed to prove, by a

preponderance of the evidence, that he acted herein under the influence of extreme emotional disturbance. Defendant's own testimony indicated that while at the time in question he had been estranged from the victim, his former wife, for some time, and had been experiencing business difficulties, these circumstances were not unusual; his explanation that he experienced 'emotion' and 'jealousy' at the mere sight of his former wife in the company of another man, did not provide a 'reasonable explanation or excuse' for defendant's asserted mental state[.]") (citing *People v. White*, 79 N.Y.2d at 903)).

In this Court's opinion, Linnen's own statements, as recorded by Detective Chella during the interrogation on the day of his arrest, greatly undermine any claim that he experienced the extreme loss of self control that the courts have held to be indicative of an extreme emotional disturbance. Even during the fatal struggle, Linnen did not exhibit a loss of self-control; he was able to describe in detail the sequence of the events that occurred, which included his brief attempt to perform CPR on Watson, and his searching through Watson's pockets for money and drugs. His actions, based on his re-telling of them, seem to have been deliberate, rather than indicative of any of the signs normally associated with an extreme emotional disturbance. "Petitioner's actions belie the notion that he 'acted with the characteristic loss of complete control associated with this defense.'" *Zamora v. Phillips*, 2006 WL 2265079, at *6 (citing *People v. Matthews*, 632 N.Y.S.2d at 300; *People v. Walker*, 64 N.Y.2d at 743); *Shiwlochan v. Portuondo*, 345 F. Supp.2d 242, 269-70 (E.D.N.Y. 2004) (finding that petitioner's efforts to hide murder weapon and evade police "[we]re products of a conscious decision" and undermined his claimed defense of extreme emotional disturbance). Even though Linnen repeatedly claimed during his interview by the detectives that he had "blackouts" and suggested that he experienced them during

the fight with decedent, his explanations of the struggle exhibit a lucidity that belies an alleged loss of consciousness. Furthermore, petitioner was able to recollect a substantial amount of detail regarding the events that occurred immediately before and after Watson's death. Thus, I cannot find that there is any reasonable probability that having testimony by an expert witness would have altered the result.

But, even assuming for the sake of argument that the evidence in Linnen's case, with the addition of the testimony of a psychiatrist, could have established the subjective element of the defense, he still would have had to establish the objective element–a reasonable explanation or excuse for the emotional disturbance. *People v. Casassa*, 49 N.Y.2d at 679 & *id.* at n.2 ("We emphasize that this [objective] test is to be applied to determine whether defendant's emotional disturbance, and not the act of killing, was supported by a reasonable explanation or excuse."). In evaluating the reasonableness of a petitioner's explanation or excuse, the trial court must determine whether the petitioner's response was "an understandable human response deserving of mercy." *Id.* at 680-81. The reasonableness of his "explanation or excuse" should not be determined solely with reference to defendant's own subjective viewpoint. *People v. Casassa*, 49 N.Y.2d at 676. Here, the "explanation or excuse" for Linnen's putative "extreme emotional disturbance" stemmed from the decedent's rejection of petitioner's alleged efforts to act as a guiding, paternal figure; the decedent's alleged criticism of petitioner's drug use; and the decedent's alleged threat to kick petitioner out of his own house. Even if Linnen had expert testimony to present his "explanation or excuse" to the jury, it was "unlikely to have induced 'the finder of fact [to exercise] the discretionary power to mitigate the penalty when presented with a situation which, under the circumstances, appears to them to have caused an understandable

weakness in one of their fellows,', as intended by the Legislature in enacting the defense[.]" *People v. Maher*, 89 N.Y.2d 456,463 (N.Y. 1997) (quoting *People v. Casassa*, 49 N.Y.2d at 680); *see also Maher*, 89 N.Y.2d at 463 ("Moreover, the victim's rejection hardly fulfilled the objective element of the extreme emotional disturbance affirmative defense [offered by defendant, the spurned lover of the victim]. . . .").[11]

Linnen has not shown that the state courts' rejection of this ineffective assistance of trial counsel claim was an incorrect application of the *Strickland* standard. This is so whether the claim is analyzed under the less deferential pre-AEDPA standard or under 28 U.S.C. § 2254(d). In particular, Linnen has failed to make a sufficient showing of prejudice; he has failed to demonstrate that if trial counsel had consulted with a psychiatric expert witness or examined Linnen's psychiatric records there is a reasonable probability that the jury would have accepted the EED defense.

---

[11] *See also Rice v. Hoke*, 846 F.2d at 166 (Acting out of anger or jealousy does not constitute a reasonable explanation or excuse.); *People v. Berk*, 217 A.D.2d 941, 943, 629 N.Y.S.2d 588, 590 (App. Div. 4th Dept. 1995) ( a defendant who witnessed his estranged wife engaged in sexual activity with another man did not have a sufficient ground for an EED defense); *People v. Hayes*, 223 A.D.2d 602, 636 N.Y.S.2d 409 (App. Div. 2d Dept. 1996) (a defendant with a protracted history of disputes with two victims did not act under an extreme emotional disturbance when he shot both of them.); *People v. Mejia*, 166 A.D.2d 675, 561 N.Y.S.2d 265 (App. Div. 2d Dept. 1990) (a defendant who had been previously menaced by the victim was held not to have acted under the influence of an extreme emotional disturbance); *People v. Tulloch*, 579 N.Y. S.2d 442, 443 (App. Div.1992) (evidence establishing defendant was "angry" and "motivated by jealousy" insufficient to warrant extreme emotional disturbance instruction); *Feris*, 535 N.Y.S.2d at 18; *Walker*, 64 N.Y.2d at 743 (evidence establishing defendant acted out of "anger or embarrassment, or both" insufficient to warrant extreme emotional disturbance charge); *People v. Knights*, 486 N.Y. S.2d 377, 379 (N.Y.App. Div.1985) ("The fact that the defendant had argued with his wife about her whereabouts earlier that evening and two months earlier had notified the police of his irritation regarding her immoral behavior is insufficient to give substance to the defense [of extreme emotional disturbance]".); *Zamora v. Phillips*, No. 04-CV-4093 (JFB), 2006 WL 2265079, at *6 (E.D.N.Y. Aug. 8, 2006) ("Zamora failed to show, under the objective element, that there was sufficient evidence for a jury to conclude that his response is one that constitutes extreme emotional disturbance. Merely witnessing a former girlfriend kissing another man does not, by itself, constitute evidence that would warrant an instruction allowing the jury to find a lesser included offense based on extreme emotional disturbance. Furthermore, Zamora's contention that he was emotionally devastated to discover Hernandez kissing Agudo is undermined by the evidence that he previously knew about their relationship–indeed, he had previously assaulted them.").

### vi. Erroneous Advice Regarding Petitioner's Right to Testify

"Issue 6:    Whether the [petitioner] was denied his Federal constitutional rights to testify at trial . . . by the misleading and fraudulent advice of his assigned counsel, which lead [sic] to the defendant's decision not to take the witness stand."

According to Linnen, trial counsel "falsely advised him that if he did not testify, the trial court would *sua sponte* instruct the jury on the defense of justification, whereas at the close of proof counsel affirmatively requested the court to charge both justification and extreme emotional disturbance." C.P.L. § 440.10 Order at 2.  Linnen asserts that he did not consent to trial counsel's request for instructions on justification and EED and suggests that but for this alleged misrepresentation, he would have taken the stand and testified that he had no involvement whatsoever in the homicide. *Id.* The motion court rejected this claim, finding "defendant has not shown that his testimony would [have] be[en] beneficial." *Id.* at 3. I agree with the motion court that "[g]iven the strength of the police testimony recounting defendant's oral admissions and the forensic evidence linking him to the homicide, counsel could have reasonably concluded that the defendant's outright denial would not be persuasive." *Id.* The record supports the motion court's conclusion that "[d]efendant's vague assertion that he was soliciting business activities at various times during the week of the homicide would not be especially probative in the context of the other evidence." *Id.* Furthermore, the trial court had issued a *Sandoval* ruling permitting the prosecutor to elicit that petitioner had been convicted of first degree manslaughter and, at the time of Watson's death, was on parole as a result of that prior conviction. As this clearly could damage petitioner's credibility were he to testify, trial counsel was "entitled to give due weight" to the ruling when advising Linnen not to take the stand. *Id.* The issue of petitioner's decision not to

testify occurred in the context of the following colloquy:

| [Defense counsel]: | I have had discussions with [petitioner] over the last few days about his testifying in this case. It has been his position throughout that he wished to testify. I've been giving him my views that I thought best, based on our trial strategy and the way that the evidence has gone, that he not testify. It's my understanding we've reached an agreement between us that he's not going to testify . . . . |
|---|---|
| The Court: | Well, I would just want to reaffirm from [petitioner] personally that this is his judgment based upon his consultation with you; but whether he agrees or disagrees, it is his judgment and his judgment alone. Do you understand that, Mr. Linnen? |
| The Defendant: | Yes, sir. |
| The Court: | All right. You have an absolute right to testify and that's not a tactical judgment that is left solely to the attorney. It is reposed solely in the accused. And if you have made an informed choice in that regard, you believe you have? |
| The Defendant: | Yes. |

T.1246-47. As the motion court found and the record clearly reflects, petitioner "specifically assured the court that he had made an informed decision not to testify[.]" *Id.* (citing T.1246-47).

### vii. Deficiencies in Monroe County's Assigned Counsel Program

| "Issue 8: | Whether the petitioner was denied his state and Federal constitutional rights to a fair trial, effective assistance of counsel, due process and equal protection of law by the unconstitutional pay structure of the assigned-counsel program, as it existed under [N.Y.] County Law 722, and affected the performance of his assigned-counsel." |
|---|---|

Linnen argued in Point Four of his C.P.L. § 440.10 motion that he was, and indigent defendants in genera, are, disadvantaged relative to both the prosecutor and those defendants who have the financial ability to retain counsel due to the insufficient pay scale for assigned attorneys set forth in N.Y. County Law § 722, in violation of the equal protection and due process clauses.

-63-

*See* Petitioner's C.P.L. § 440.10 Motion at 34-56.  Although Linnen mentions general notions of

equal protection and due process, the crux of this point is that Linnen's trial counsel could not and

would not render constitutionally effective assistance because he knew he would not be

sufficiently reimbursed for his time. For instance, Linnen repeats his allegations from the other

branches of his C.P.L. § 440.10 motion dealing with trial counsel's failure to conduct adequate

pre-trial investigative work and failure to call witnesses.

The C.P.L. § 440.10 court denied the claim, holding that petitioner "could have placed

sufficient facts upon the record to have allowed the appellate division to entertain this argument"

but he "failed to do so[,]" and "[m]oreover, the defendant has not shown that he was actually

prejudiced by the operation of the statute." C.P.L. § 440.10 Order at 4. As detailed above in this

Decision and Order, I have concluded that all of Linnen's claims of ineffective assistance of

counsel should be denied. Thus, I agree with the C.P.L. § 440.10 court that Linnen has not

demonstrated that he was prejudiced by the assigned counsel statute; he has failed to show either

that as his assigned trial counsel performed deficiently, or that the outcome of the trial would have

been different but for the fact that he had assigned counsel.

**4.     Denial of Fair Trial Due to Erroneous Retention of Statutorily Unqualified Juror on Jury and Failure of Trial Court to Follow Procedures of C.P.L. § 270.35**

"Issue 2:     Whether petitioner "was deprived of a fair trial by the court's failure to follow the correct law and procedure[, N.Y. Crim. Proc. Law § 270.35] in matters pertaining to a sworn juror."

"Issue 3:     Whether [petitioner] was denied a fair trial contrary to the constitution of the State of New York and the United States."

"Issue 7:     Whether the [petitioner] was denied his Federal constitutional rights to an impartial jury, a jury of his choice, and the effective assistance of counsel by his assigned-counsel's failure to exercise the [petitioner's] request to remove a statutorily unqualified juror

from the jury panel."

After the jury was sworn, but before testimony commenced, the decedent's mother informed the trial judge that she recognized one of the jurors, Donald Barr. The trial court excused the jury and questioned Juror Barr in the presence of the decedent's mother and brother. The judge then allowed defense counsel and the prosecutor to question the juror. T.51-67. Juror Barr and his family had resided in the Perry Projects in the 1960s, where the decedent's mother and family had also lived. Although Barr's family moved when he was in second grade, he would return there to visit his aunt and would encounter the decedent's mother during some of his visits. Juror Barr did not keep in contact with the decedent's mother over the years, but "she was always a friend" and "whenever [he saw] her, it was, how you doing." T.51-54. Barr stated that his prior acquaintance with the decedent's mother and grandmother would not affect his ability to be independent and impartial because he did not know the decedent and the decedent's brothers "like that [sic]" and did not have a personal vendetta one way or the other. T.55-57. The juror also reminded the parties that he had revealed, during *voir dire*, that his niece had been murdered nine months previously and that he was concerned with finding the truth. The juror stated that he did not want to be "on anybody's side" in a situation where one person had been killed and another person possibly could lose his life in a jail sentence. T.58.

In response to further questioning by defense counsel as to whether he felt he had to "answer to" the decedent's mother or anyone else for his verdict, Juror Barr replied,

> I think – I think for as long as I've known her and as long as she's known me, she's always known me to be a straight shooter, nothing deviant in my behavior, and I've never known her to be that way. I don't think she would expect anything less from me, other than being a straight shooter. I don't see any other course of way [sic] I could react.

T.58.

The trial judge read aloud the pertinent parts of C.P.L. § 270.35, New York's procedural statute governing such matters. The judge acknowledged that one of the alternate jurors could replace Juror Barr. The judge said that it was essentially the defense's call, and gave the defense what was tantamount to the right to exercise a peremptory challenge based on the new information revealed about Juror Barr's earlier acquaintance with members of the decedent's family.[12] The court and encouraged defense counsel and petitioner to confer on the matter. After doing so, trial counsel informed the court that both he and Linnen believed that Juror Barr was going to do his best to be fair and impartial and that they would not seek to have him removed from the jury. T.63-65. The trial judge specifically informed petitioner that if he wished Juror Barr to be replaced by an alternate, he was prepared to follow that course. Linnen stated, however, that he was going to follow the advice of his attorney and keep Juror Barr. The prosecutor raised no objection to the defense's decision not to exclude the juror.

On direct appeal, petitioner's appellate counsel argued that the trial court mishandled the issue by not making a sufficient inquiry pursuant to C.P.L. § 270.35. Counsel argued that by advising the defense that it had the right to determine whether or not to retain Juror Barr, the trial

---

[12] The trial court commented,

I just want the defendant to know that if he chose to challenge Mr. Barr based upon the fact of this relationship, tenuous though it is, and relatively remote as it is, I would recognize that right, notwithstanding the stage of the proceeding we're in.

I also should state . . . that Mr. Barr was very forthright in his statements, that there was no hesitancy in his position and that he called himself a straight shooter. And, although he knows the mother of the deceased, he has not seen her in some period of time and that he will call it the way he sees it. And there are twelve people who must make this judgment, not one, and . . . he's willing to serve notwithstanding.

T.64.

court "was abdicating its responsibility and improperly shifting the burden of making that decision to the [defendant] and his attorney." Pet'r App. Br. at 35. Petitioner's appellate counsel argued that, as a result, Linnen was denied his constitutional right to a fair trial by an impartial jury. *Id.* at 37 (citations omitted). In his *pro se* supplemental appellate brief, petitioner argued that the trial court should have, *sua sponte*, overruled petitioner's decision to keep the juror. Pet'r Pro Se Supplemental App. Br. at 34-36.

C.P.L. § 270.35 provides that

> [i]f at any time after the trial jury has been sworn and before its rendition of a verdict the court is satisfied, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve . . . , or that a juror has engaged in misconduct of a substantial nature . . . , the court may, if an alternative juror . . . is available for service, discharge such trial juror and order that he be replaced.

N.Y. CRIM. PROC. LAW § 270.35. In federal habeas action, findings of state court justice, including finding that juror's conduct did not impair his ability to render impartial verdict made pursuant to CPL § 270.35 were presumptively correct. *Smith v. Phillips*, 455 U.S. 209, 218 (1982) (citing *Sumner v. Mata*, 449 U.S. 539, 551 (1981)). Habeas courts in this Circuit have routinely rejected claims that a trial court improperly delegated its duties under C.P.L. § 270.35 on the basis that such claims involve only a matter of state procedural law and do not present a federal constitutional question. *E.g.*, *Khan v. Fischer*, 583 F. Supp.2d 390, 390 (E.D.N.Y. 2008) ("Petitioner claims that the trial court improperly delegated to its law secretary its duty to make the "reasonably thorough inquiry" required by New York's Criminal Procedure Law § 270.35 before discharging a juror no longer able to serve because of illness. This claim involves only a matter of state law and is not cognizable here. It is also utterly frivolous: the record shows that, upon learning that the sworn juror in question had been struck by a car, the trial court first

adjourned the case for a day; the following day, the law secretary reported to the court that the juror had telephoned to confirm her inability to serve, and the court replaced her with an alternate without any objection from defense counsel."); *Hughes v. Phillips*, 457 F. Supp.2d 343, 368 (S.D.N.Y. 2006) ("The trial court exercised the discretion vested in it under [N.Y. Crim. Proc. Law §] 270.35(2)], which governs the dismissal of a sworn juror and authorized a trial court to dismiss a sworn juror if it determines, *inter alia*, that the juror will be unable to serve due to illness. Such dismissal is authorized as soon as the trial court determines through a reasonable inquiry that the juror will not appear within two hours of the scheduled time trial was to resume. The court fully satisfied its statutory obligation to make that reasonable inquiry, afford the parties an opportunity to be heard and set upon the record the reasons for its decision. And since CPL 270.35(2) is not unconstitutional, there can be no claim of federal constitutional dimension that might warrant habeas relief.") (internal citations omitted).

As related above, petitioner first blamed his attorney for making that decision. Petitioner also claims that the court erred in the manner of handling the matter, in effect arguing that the court should have overruled petitioner's decision to keep the juror. Here, the trial court painstakingly gave petitioner every opportunity to remove the juror, but petitioner, in consultation with his trial attorney,  himself decided to keep the juror.

**5.      Insufficiency of the Evidence to Prove Guilt Beyond a Reasonable Doubt**

> "Issue 4:      Whether, as a matter of law, the [petitioner's] conviction was based on sufficient evidence under the State and Federal Constitutional standards."

Petitioner argues that the evidence was insufficient to support his conviction. In particular, petitioner alleges that he is totally innocent of the charges. I agree with respondent's

argument that this claim is unexhausted but procedurally defaulted.

A petitioner must exhaust all available state remedies either on direct appeal or through a collateral attack of his conviction before he may seek a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994), *cert. denied*, 514 U.S. 1054 (1995). The Supreme Court requires habeas petitioners to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). The exhaustion of state remedies requirement means that the petitioner must have presented his constitutional claim to the highest state court from which a decision can be obtained. *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000) (citing *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir.1991)). In New York, therefore, if claims are rejected on direct appeal, a petitioner must seek to have these claims considered by the New York Court of Appeals. *See Gray v. Netherland*, 518 U.S. 152, 163 (1996) (noting that claims presented to the highest state court must be essentially the same as those raised in the habeas petition). A claim is properly exhausted when the state court is fairly apprised of the claim's federal nature and of the factual and legal premises underlying the claim. *Grey*, 933 F.2d at 119-20.

Linnen's insufficiency-of-the-evidence claim was not raised on direct appeal to the Appellate Division. Rather, the only evidentiary claim presented to the Appellate Division was that the verdict was against the weight of the evidence. These two claims call for distinctly different analyses. *People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 763, 508 N.E.2d 672 (N.Y. 1987); *accord*, *e.g.*, *Roman v. Filion*, 2005 WL 1383167, at *30 (S.D.N.Y. Jun 10, 2005). The weight-of-the-evidence claim was summarily rejected in the appellate division's order

affirming Linnen's conviction. When he sought discretionary leave from the New York Court of Appeals to appeal this order, Linnen raised, for the first time, a claim that the evidence was insufficient to support his conviction. However, "[p]resenting a claim for the first time to a state court of discretionary review is insufficient to exhaust the claim unless the court considers it." *Lurie v. Wittner*, 228 F.3d 113 (2d Cir. 2000) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). Here, the New York Court of Appeals denied leave to appeal. Thus, the claim remains unexhausted.

Linnen is, however, procedurally barred from returning to state court to exhaust the claim. First of all, Lewis has already used the one direct appeal to which he is entitled. N.Y. COURT RULE § 500.10(a). Secondly, if Linnen were to raise the claim in connection with a C.P.L. § 440.10 collateral motion to vacate the judgment, the state court would be required to deny the motion because the issue was apparent from the trial record and could have been raised on direct appeal. N.Y. CRIM. PROC. LAW § 440.10(2)(c). Under these circumstances, the claim is deemed exhausted but procedurally defaulted. *See Grey v. Hoke*, 933 F.2d at 120-21.

The Supreme Court has held that a procedural default will "bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice,'" *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations omitted). The fundamental miscarriage of justice exception requires that the petitioner establish that the constitutional error in his trial "'has probably resulted in the conviction of one who is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To be credible, a claim of actual innocence requires a

petitioner to support his allegations of constitutional error with "new reliable evidence . . . that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Lewis has not attempted to make any showing of cause for the default and resultant prejudice, and he has never asserted that he is actually innocent of the crimes of which he was convicted. Nor does the alleged recantation by the complainant support a claim of "actual innocence," since, as discussed below, the recanting affidavit is inherently unreliable and unworthy of belief. Thus, Lewis is unable to overcome the procedural default, and habeas review of his insufficiency-of-the-evidence claim is precluded.

**6.      Due Process Violation Resulting From Prosecutor's Failure to Disclose *Brady* and *Rosario* Material**

> "Issue 9:        [F]ailure of the prosecutor . . . to hand over to the defense, at the suppression hearing and at trial, *Rosario* and *Brady* materials generated, collected and/or recorded by Detective Ortiz and Chella during their investigation . . . ."

At trial, the defense obtained a copy of a booking form generated at the time petitioner's arrest had not been disclosed to the defense. The form noted that petitioner was under the influence of drugs and alcohol. Petitioner argued in his CPL 440 motion that he was deprived of impeachment material at his suppression hearing. Petitioner's Memorandum of Law, pp. 57-63. The C.P.L. § 440.10 court rejected his claim on the procedural ground that he unjustifiably failed to raise it on direct appeal. C.P.L. § 440.10 Order dated December 3, 2003, at 4. In addition to being barred by a procedural default for which petitioner cannot show cause and prejudice, or a fundamental miscarriage of justice, the claim is meritless. The booking form could not be impeachment material for another person's testimony as Suzanne Cairns, the individual who prepared the report testified that petitioner himself was the source of the information he was

drunk and under the influence of drugs:

> Q. Now, the next question, question four, does prisoner appear to be under the influence of alcohol or drugs. There is a circle around alcohol. Did you do that?
>
> A. Yes, I did.
>
> Q. And there's a reference to weed and crack. Was that your writing, as well?
>
> A. Yes.
>
> Q. From what source did that information come?
>
> A. We ask every prisoner we book, have you had drug, alcohol or marijuana in the past 24 hours. If they answer yes, we mark it down. And I ask them what and I note it, either alcohol, or if they say crack, I write crack. If they say just marijuana, then I write just marijuana. *It's what the defendant–the information he gives me.*
>
> . . .
>
> Q. Now, Ms. Cairns, have you had any training to detect how people appear if they're under cocaine, as opposed to marijuana?
>
> A. No, I've had no training for that.
>
> Q. Have you had any training to determine what the difference in people may be if they're acting under the influence of alcohol, as opposed to marijuana?
>
> A. No, I have not.
>
> Q. And do you have any expertise in identifying the symptoms of people who may be under the influence of any of those drugs?
>
> A. I would say no, I do not.
>
> Q. *That question number four, does the prisoner appear to be under the influence of alcohol or drugs, do you ask for the officer's opinion?*
>
> A. *No. I ask the defendant himself.*
>
> Q. And is that the procedure that you were taught?
>
> A. Yes, it is.
>
> Q. And this form, has this been the form that has been used ever since you started there?
>
> A. Yes, it is. Well, wait a minute. I stand corrected. We did make a few changes to the form several years ago, but it's in relation to some medical questions at the top of the form. They just added some additional questions.

T.734-37 (emphases supplied).  In light of Cairns' testimony, Linnen's contention that Detective

Chella supplied the information that Linnen was on "weed and crack" is simply not credible. The

booking sheet could not have been used to impeach Detective Chella since, as Cairns testified,

Linnen, and not Chella, described Linnen as having used "weed and crack." Linnen thus has failed to meet any of the requirements of the *Brady* standard. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (To establish a *Brady* violation, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.).

To the extent that Linnen claims a violation of the rule set forth in *People v. Rosario* that the prosecution must turn over all witnesses' statements, regardless of whether they are favorable, such a claim is not cognizable on habeas review because it presents only an issue of New York state law. *See*, *e.g.*, *Randolph v. Warden, Clinton Correctional Facility*, No. 04 CIV. 6126, 2005 WL 2861606, at *5 (S.D.N.Y. Nov. 1, 2005) ("the failure to turn over *Rosario* material is not a basis for habeas relief as the Rosario rule is purely one of state law"); *Del Pilar v. Phillips*, No. 03 CIV.8636, 2004 WL 1627220, at * 13 n. 33 (S.D.N.Y. July 21, 2004) ("[t]o the extent that this claim is based on a Rosario violation, it must fail, because a habeas petition can only be granted to remedy some violation of federal law; the obligation to turn over Rosario material arises under state law") (internal quotation and citation omitted); *Stephens v. Costello*, 55 F.Supp.2d 163, 167 (W.D.N.Y.1999) ("failure to turn over *Rosario* material is not a basis for habeas relief as the *Rosario* rule is purely one of state law"); *Johnson v. Filion*, 232 F.Supp.2d 98, 99 (S.D.N.Y. 2002) ("Failure to turn over *Rosario* material is not a basis for habeas relief as the *Rosario* rule is purely one of state law.") (quoting *Green v. Artuz*, 990 F.Supp. 267, 274 (S.D.N.Y.1998)).

7.      **Prosecutorial Misconduct**

"Issue 13:      Whether the prosecutor's prejudicial summation, failure to seek

> *Molineux/Ventimiglia* rulings regarding alleged prior bad acts of
> the [petitioner], encouragement of false testimony, failure to
> truthfully give reasons for not producing a crucial missing witness,
> and manipulation of various pieces of evidence denied the
> [petitioner] the right to a fair trial and due process of law."

The only venue that Linnen asserted the claims contained in "Issue 13" was in support of
Point Nine of his C.P.L. § 440.10 motion. *See* Petitioner's C.P.L. § 440.10 Motion at 97-106.
The trial court rejected the claims based on the mandatory procedural rule set forth in C.P.L. §
440.10(2)(c), holding that petitioner's "allegations of prejudicial comments, misstatements, and
improper use of a time-line in summation, 'manipulation of photographic evidence', the failure
to obtain a *Molineux* ruling, and the exercise of a race-based peremptory challenge, are matters of
record that the defendant failed to raise on direct appeal." C.P.L. § 440.10 Order at 5-6; *see* N.Y.
CRIM. PROC. LAW § 440.10(2)(c).  Thus, the trial court found Linnen's prosecutorial misconduct
claims to be procedurally defaulted under C.P.L. § 440.10(2)(c).

"Federal courts may not review state court decisions that rest on an adequate and
independent state procedural default unless petitioner can show both cause and prejudice [for the
procedural default]." *Fama v. Commissioner of Correctional Servs.*, 235 F.3d 804, 809 (2d Cir.
2000). A procedural bar is "adequate" if it is "based on a rule that is 'firmly established and
regularly followed' by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir.1999)
(citing *Ford v. Georgia*, 498 U.S. 411, 423-34 (1991)). The Second Circuit has "deferred to
findings of procedural default as long as they are supported by a 'fair or substantial basis' in state
law." *Garcia*, 188 F.3d at 78. Based on the record before the Court, there is a "fair or substantial
basis" in state law for the trial court's finding of procedural default regarding Linnen's
prosecutorial misconduct claims and they prosecutorial misconduct claims cannot be reviewed

unless he can show both cause for and prejudice resulting from the default. *See Fama*, 235 F.3d at 809. Linnen has not attempted to establish cause for or prejudice from his procedural default, and, in any event, his complaints regarding the prosecutor are unsubstantiated and without merit. Linnen, therefore, is not entitled to habeas relief on any prosecutorial misconduct grounds.

**8.     Denial of Sixth Amendment Right to Effective Assistance of Appellate Counsel**

> "Issue 15:     Whether the defendant was denied the effective assistance of counsel . . . when appellate counsel took a position in her brief that was adverse and contrary to the [petitioner]'s pro-se submissions at sentencing, post trial motion proceedings, and within his pro-se appellate brief."

While the *Strickland* standard for assessing claims of ineffective assistance, set forth above, was formulated in the context of evaluating the effectiveness of trial counsel, the same standard applies to claims regarding the performance of appellate counsel. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994); *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir.1992)). Linnen claims that appellate counsel performed deficiently by purportedly taking a position legally adverse to the arguments he made in his *pro se* supplemental appellate brief. As trial counsel pointed out at sentencing, petitioner's detailed confession to strangling the decedent limited the defense's options. Appellate counsel, like trial counsel, reasonably made arguments based upon the defenses of justification and extreme emotional disturbance, strategies that were largely informed by petitioner's admissions to police. As respondent points out, petitioner's argument boils down to faulting appellate counsel for not making arguments based upon petitioner's declaration, at the sentencing hearing, that he was innocent. *See* Petition for Writ of Error *Coram Nobis*, dated February 26, 2005, pp. 1-5. The Appellate Division summarily rejected his claims

of ineffective assistance of appellate counsel, holding that the *coram nobis* petition was "denied." *People v. Linnen*, 19 A.D.3d 1185, 796 N.Y.S.2d 568 (App. Div. 4th Dept.), *leave to appeal denied*, 5 N.Y.3d 807 (N.Y. 2005). Linnen has offered no evidence of his innocence, other than his own self-serving protestations made at the sentencing hearing. Thus, appellate counsel had no basis on which to put forward arguments of "actual innocence" on direct appeal. Appellate counsel cannot be found ineffective for omitting a claim which had no likelihood of success on appeal, and a petitioner cannot be prejudiced as a result of appellate counsel's failure to raise meritless claims. *See Mayo v. Henderson,* 13 F.3d at 534 ("To establish prejudice in the appellate context, a petitioner must demonstrate that there was a 'reasonable probability' that [his] claim would have been successful . . . ." (alteration in original)) (quoting *Claudio v. Scully*, 982 F.2d at 803). This claim does not warrant habeas relief.

### 9.      Failure of Appellate Counsel to Conduct Post-Trial Investigations

> "Issue 16:      Whether the defendant was denied his State and Federal constitutional rights to the effective assistance of appellate counsel, due process, and equal protection of the law by the failure of appellate counsel to pursue post trial investigations relative to this case."

Linnen contends that appellate counsel was ineffective because she did not undertake the factual investigation that Linnen contends his trial counsel should have performed but did not. *See* Petition at 31 (Dkt. #1). Linnen also suggests that appellate counsel ignored materials that he sent to her "concerning the credibility of the police, *Brady* violations, and other issues," which he does not specify. *Id.* To the extent that Linnen wanted appellate counsel to raise claims that were not based upon evidence in the record, such claims could not assist him in obtaining reversal of his conviction because claims and matters outside the record cannot be raised on direct appeal.

*See, e.g.*, *People v.* , 152 A.D.2d 644, 645, 543 N.Y.S.2d 171, 172) ("The defendant's claim that

he was not afforded the effective assistance of counsel is based on matters which are dehors the

record, which matters are not reviewable on direct appeal. The appropriate remedy is a

postconviction motion pursuant to CPL 440.10.") (internal citations omitted); *People v. Brooks*,

105 A.D.2d 977, 978, 481 N.Y.S.2d 914, 916 (App. Div. 3d Dept. 1984) (holding that where

record did not substantiate assertion that defendant was arraigned in February 1981, issues

premised on the alleged arraignment were not properly before appellate court on defendant's

direct appeal of his criminal conviction, since that court was bound by the certified record on

appeal) (citing *Interstate Window Cleaning Co., Inc. v. Morse/Diesel, Inc.*, 89 A.D.2d 820, 820,

453 N.Y.S.2d 526, 527 (App. Div. 4th Dept. 1982) ("[I]it is well established that this court [an

Appellate Division of New York State Supreme Court] is bound by the certified record on appeal

and does not consider matters contained in a party's brief which are not properly contained in the

record[.]") (citations omitted)).  This claim does not warrant habeas relief.

**10.    Failure to Raise "Stronger" Issues on Appeal**

> "Issue 17:    Whether the [petitioner] was denied the State and Federal
> constitutional right to the effective assistance of counsel and due
> process of law by assigned appellate counsel's failure to bring
> stronger issues on appeal."

Linnen criticizes appellate counsel for failing to raise nine purportedly issues that were

purportedly stronger than those that she raised in her appellate brief. *See* Petition for Writ of

Error *Coram Nobis*, dated February 26, 2005, pp. 9-19.  The *Strickland* test, which applies to

claims of ineffective assistance of appellate counsel as well to claims of ineffective assistance of

trial counsel, *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994), is not satisfied here.  It is

well-established that appellate counsel is not obligated to "make every non-frivolous argument that could have been made" on appeal. *Id.*; *see also Jones v. Barnes*, 463 U.S. 745, 753 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy . . . . . Nothing in the Constitution or our interpretation of that document requires such a standard."); *see also id.* at 751 (noting that no Supreme Court decision ""suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points"). Linnen simply cannot show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo*, 13 F.3d at 533. No claim that Linnen contends appellate counsel should have raised is stronger than any presented to the Appellate Division by Linnen's counsel on direct appeal. Indeed, Linnen has presented the omitted issues in his own *pro se* applications to the Appellate Division and other courts, including this one, and they have been uniformly rejected. Linnen has failed to establish either that appellate counsel's performance in connection with his direct appeal fell below an objective standard of reasonableness so as to satisfy the first prong of the *Strickland* test, or that he was prejudiced thereby. *E.g.*, *Velez v. United States*, No. 05 Civ. 0537(RCC), 2006 WL 1952191, *7 (S.D.N.Y. July 10, 2006)). Accordingly, habeas relief is not warranted.

11.     **Denial of Sixth Amendment Right to Be Present at Material Stage of Trial**

> "Issue 20:     Whether the [petitioner]'s absence during a material stage of the proceedings against him was in violation of the right to be present at all material stages of the trial against him."

Petitioner alleges that before the suppression hearing, "an [sic] half hour conference was held without the presence of the defendant, and without a record being made. This conference had direct bearing on certain factual issues relative to the defendant's case, and he had an absolute right to be present, but was not." Petition at 21. Petitioner provides no further factual details regarding this claim, and cites case law in support. Indeed, the Court has been unable to find where this claim was raised in any of Linnen's applications for relief in state court. In any event, it is too vague to provide a basis for habeas relief. "A criminal defendant is entitled 'to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir.1998) (quoting *Faretta v. California*, 422 U.S. 806, 819-20 n. 15 (1975) and citing *Illinois v. Allen*, 397 U.S. 337, 338 (1970)). The constitutional right of a criminal defendant to be present at all material stages of a trial is rooted in the Sixth Amendment, but is protected by the Due Process Clause of the Constitution in situations where the defendant is not actually confronting witnesses or evidence. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985). In *Snyder v. Massachusetts*, 291 U.S. 97 (1934), the Supreme Court explained that a criminal defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Id.* at 105-06. A defendant's physical presence " is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Id.* at 107-08. " While New York state law recognizes a defendant's right to be present where 'the proceeding involve[s] factual matters about which defendant might have peculiar knowledge that would be useful in advancing the defendant's or countering the [prosecutor's] position,' *People v. Dokes*, 79 N.Y.2d 656, 660, 584

N.Y.S.2d 761, 595 N.E.2d 836 (1992), federal law has no such doctrine. Thus the discussion of 'factual' matters does not by itself trigger a federal constitutional right to be present at the sidebar." *Wilson v. Bennett*, 188 F. Supp.2d 347, 357 (S.D.N.Y. 2002).

Apart from Linnen's assertion that he had "factual" information to offer, he has not come forward with any evidence suggesting that his presence during this sidebar conference would have had any effect on the course of the suppression hearing or the trial. In sum, Linnen has failed to make any showing that his presence during the bench conference was required to ensure him a "fair and just hearing," or a "reasonably substantial . . . opportunity [for him] to defend against the charge." *Snyder*, 291 U.S. at 105-06.

## 12.    Miscellaneous Claims

> "Issue 18:    Was the [A]ppellate [D]ivision's order, denying habeas
> corpus relief, sufficient–on its face–to allow for informed
> Federal review under the demands of Title 28 U.S.C.A.
> 2254, et seq."

The Court is unclear as to what exactly Linnen is arguing. As an initial matter, I note that there is no Appellate Division order denying habeas relief.  Applications for habeas corpus relief under New York state's habeas statute are properly brought in New York State Supreme Court, the trial court. Furthermore, Linnen did not prosecute a state-court habeas corpus petition. He may be complaining that the Appellate Division's summary dismissal of some his claims as "without merit" without citing to Federal law. The Second Circuit consistently has held that "an unexplained ruling on the merits is also entitled to AEDPA deference." *Murden v. Artuz*, 497 F.3d at 198 (citing *Jimenez*, 458 F.3d at 143 (citing *Sellan v. Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001)).

Linnen's remaining "Issues" are as follows:

"Issue 14:     Whether, as a matter of law, a CPL 440.10 motion may be used to
              correct factual irregularities for appellate and Federal review where
              assigned-counsel has failed, by neglect or misrepresentation, to
              adequately preserve and protect the record for informed Federal
              review in violation of the defendant's rights to due process and the
              effective assistance of counsel."

"Issue 19:     Whether a uniform method of deciding appellate *coram nobis*
              applications are [sic] needed that will address the merits of the
              claims brought by the defendant."

"Issue 21:     Was the defendant's right to due process violated when the motion
              court took over a year to answer CPL 440.10 motion in order to
              take advantage of procedural bars in order to deny the motion."

"Issue 23:     Whether the district attorney's response to, and the trial court's
              specific determination of, the issues brought by this defendant's
              pro-se CPL 330.30 motion was [sic] sufficient to preserve, as a
              matter of law, those issues for appellate and federal review."

Under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only

on the ground that he is in custody in violation of the Constitution or laws or treaties of the

United States."  In the above-quoted allegations, Linnen has failed to demonstrate in any way

how the State of New York violated his Constitutional rights or any treaty or laws of the United

States, resulting in illegal state custody. Consequently, I cannot find that they state a colorable

claim upon which federal habeas relief may be granted.  "Issue 14", "Issue 19", "Issue 21", and

"Issue 23", and other allegations that may be related to these issues but not specifically

mentioned here, accordingly are dismissed.

"Issue 24:     Was the defendant denied his State and Federal constitutional
              rights to the assistance of counsel when the trial court failed to

assigned [sic] him an attorney for his CPL 330.30 motion."

C.P.L. § 330.30 provides that "[a]t any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following grounds: 1. Any ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court." N.Y. Crim. Proc. Law § 330.30(1). Linnen filed a *pro se* motion under C.P.L. § 330.30, alleging that trial counsel was ineffective assistance on numerous bases; that his confession was unconstitutionally obtained; that the prosecutor committed various instances of misconduct throughout the trial; and an unqualified and biased juror (Donald Barr) was wrongly allowed to remain on the jury. *See* A.352 *et seq.* Linnen seems to be arguing that he had a conflict of interest with his trial counsel and therefore was entitled to have new counsel assigned to represent him in connection with the C.P.L. § 330.30 motion. This claim is without merit. *See People v. Jones*, 261 A.D.2d 920, 920, 690 N.Y.S.2d 366, 367 (App. Div. 4th Dept. 1999) ("Upon our review of the record, we conclude that defense counsel, who had no duty to support a motion that he determined to be without merit (*see*, *People v. Vasquez*, 70 N.Y.2d 1, 4, 516 N.Y.S.2d 921, 509 N.E.2d 934, *rearg. denied*, 70 N.Y.2d 748, 519 N.Y.S.2d 1034, 514 N.E.2d 392), did not take a position adverse to his client. Thus, defendant was not entitled to the assignment of new counsel for the [C.P.L. § 330.30] motion[.]").

## CONCLUSION

For the foregoing reasons, Anthony Linnen's petition request for a writ of habeas corpus

is denied and the petition is dismissed. Because Linnen has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I decline to issue a certificate of appealability.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: February 24, 2010
      Rochester, New York.